Jacob L. PETE and James W. Pete

v.

The UNITED STATES.

No. 17–72.

United States Court of Claims.

March 17, 1976.

Ernest I. Reveal, III, St. Paul, Minn., for plaintiff. Solly Robins, St. Paul, Minn., atty. of record. Robins, Davis & Lyons, St. Paul, Minn., of counsel.

Herbert Pittle, Washington, D.C., with whom was Asst. Atty. Gen. Peter R. Taft, Washington, D.C., for defendant.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and DAVIS, Judge.

## OPINION

PER CURIAM:

This case comes before the court on defendant's exceptions to the recommended decision, filed August 19, 1975, by Trial Judge Charlotte P. Murphy, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth *, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 131(c).

## OPINION OF TRIAL JUDGE

MURPHY, Trial Judge: This action is brought by plaintiffs seeking just compensation under the Fifth Amendment and 28 U.S.C. § 1491 (Supp. II, 1972), plus interest and costs, for plaintiffs' three cabin barges or large houseboats, whose usefulness has been effectively destroyed by inverse condemnation .action of defendant. The factual issues before the Court in this case are:

1. Whether it was impossible to remove the three cabin barges intact over land from their floating location on Hoist Bay in land-locked Basswood Lake, Minnesota.

2. Whether it was technically and physically impractical to disassemble the three cabin barges, transport them out of the Boundary Waters Canoe Area in the Superior National Forest in northeastern Minnesota, and reassemble them elsewhere for further use.

3. What was the fair market value of the three cabin barges as of January 19, 1966.

The legal issue is:

4. Whether defendant's action, banning the use within the Boundary Waters Canoe Area of plaintiffs' three floating motor powered barges for commercial purposes, constitutes an inverse condemnation compensable under the Fifth Amendment and 28 U.S.C. § 1491 (Supp. II, 1972).

For reasons hereafter discussed, the Court holds for plaintiffs.

I.

Prior to January 19, 1966, plaintiff, Jacob L. Pete (the father) and plaintiff, James W. Pete (the son) were owners of 59 acres of land on Hoist Bay in Basswood Lake in northern Minnesota, about 4 miles from the Canadian border. Basswood Lake overlaps the border between the two countries. Both plaintiffs were born and have always resided in Ely, Minnesota, 17 miles from the Canadian border.

Each of the Petes owned an undivided one-half of an undivided one-quarter interest in the real estate. The remaining interest was owned by the Izaak Walton League of America Endowment. Plaintiffs' land consisted of two noncontiguous parcels. The larger parcel of about 40 acres was unimproved land, while the smaller parcel was the headquarters of the Petes' business and source of livelihood, called Pete's Cabin Boats. Each of the Petes owned an undivided one-half interest in the business and all improvements on this land.

The Petes also owned three large floating cabin barges, called the Jacob L., the Russell Lee, and the Gail Adena. These barges had steel or steel plated hulls, two-story deckhouses with steel pipe railings containing lounges, galleys, cabins and sleeping accommodations for a total of 38 people. The barges were 40–50 feet long; 16–20 feet wide; about 20 feet high; 44–61 tons

---

* Whereas the court adopts the trial judge's separate findings of fact which are set forth in her report filed August 19, 1975, they are not print-ed herein since such facts as are necessary to the decision are contained in her opinion.

gross weight or 50,000—75,000 pounds weight by water displacement; and had 50–110 horsepower engines.

These barges were built on site, because Basswood Lake was virtually landlocked and transportation of objects of that size and weight to plaintiffs' base of business activity at Hoist Bay was difficult, if not impossible. In summer, these barges were used to transport, house, and feed hunting and fishing parties. In winter, they housed hardy hunters. As required by State law, plaintiffs obtained a hotel and motel license for the operation of their barges.

In 1964, Congress passed the Wilderness Act, 16 U.S.C. § 1131 et seq. (1964). Under the authority of this Act, the United States in cooperation with Canada established a four million acre wilderness area in northeastern Minnesota and Canada. Section 1133(c) specifically banned structures, installations, commercial enterprises, permanent or temporary roads, use of motor vehicles, motorized equipment, motorboats, aircraft landing, or other form of mechanical transport in a wilderness area, subject to existing private rights and other specific statutory provisions of the Act.

The roadless area of the northern portion of the Superior National Forest in Minnesota, renamed the Boundary Waters Canoe Area (hereafter BWCA),[1] was specifically to be governed by regulations which the Secretary of Agriculture was directed to establish:

> * * * [I]n accordance with the general purpose of maintaining, without unnecessary restrictions on other uses, including that of timber, the primitive character of the area, particularly in the vicinity of lakes, streams, and portages: *Provided,* That nothing in this chapter shall preclude the continuance within the area of any already established use of motorboats. [16 U.S.C. § 1133(d)(5) (1964).]

On December 21, 1965, the Secretary of Agriculture promulgated regulations governing the use and enjoyment of the area. Originally, 36 C.F.R. § 251.85 (1967), now 36 C.F.R. § 293.16 (1974). The regulations banned all commercial enterprises, privately owned property, private buildings, floating living quarters, aircraft, permanent roads, and the storage or mooring of boats throughout the BWCA.

On January 19, 1966 under the Declaration of Taking Act, 40 U.S.C. § 258a (1964), defendant filed a complaint and declaration of taking in the District Court of the District of Minnesota, and obtained an order for immediate possession of plaintiffs' land. In an effort to continue to operate their business even on a limited basis, plaintiffs filed an application for a special use permit to conduct daily sight seeing trips around Basswood Lake by cabin barge for senior citizens and persons unable to canoe or backpack, but the application was denied by the Forest Service. Simultaneously, plaintiffs and defendant were attempting to negotiate a land trade, plaintiffs' land for Government-owned land outside the BWCA.

In 1969, these negotiations terminated and plaintiffs were ordered to cease their business operations and remove all personal or movable equipment. As a consequence, defendant's Declaration of Taking action was tried in the Federal District Court for the District of Minnesota at Duluth by Judge Philip Neville on June 23—July 2, 1969, with a decision being filed on September 11, 1969.[2] A second trial was held by Judge Neville in June 1970, after which the determination was appealed to the Eighth Circuit, which handed down a reversing decision on August 25, 1971, with the latter decision being modified on October 1, 1971.[3]

1. The nearest town outside the BWCA was Ely, Minnesota, 8 miles away, in the extreme northeastern corner of Minnesota.

2. *United States v. 967.905 Acres of Land, (claim of Jacob and James Pete),* 305 F.Supp. 83 (D.Minn.1969), which contains additional factual details of the history of plaintiffs' Hoist Bay location and operation.

3. *United States v. 967.905 Acres of Land,* 447 F.2d 764, 766 (8th Cir. 1971), *cert. denied* 405 U.S. 974, 92 S.Ct. 1193, 31 L.Ed.2d 248 (1972).

At the district court trial, defendant contended it had taken only the real estate and structures permanently attached to that realty. Plaintiffs argued that the three cabin barges were fixtures under Minnesota law and, therefore, a part of the realty. Plaintiffs were able to convince two juries and a district court judge, but not the Eighth Circuit, of the merit of their contention that at the time of the taking in January 1966, the barges were a necessary, integral, and component part of plaintiffs' land operation and, therefore, the barges were considered constructively annexed to the land and were fixtures.

Since the barges were not fixtures, they were not covered by the original declaration of taking and the district court had no jurisdiction over them. The parties, subsequently, reached an agreement with respect to the real estate. Thus, plaintiffs' remaining claim—for just compensation for the Fifth Amendment taking of the three cabin barges by inverse condemnation—is the subject of the litigation in this Court under 28 U.S.C. § 1491 (Supp. II, 1972). Four days of trial were held in St. Paul, Minnesota.

## II.

### Expert Witnesses

The crucial evidence on each of the factual questions in the instant case is the expert testimony, the adequacy of their expert qualifications, and the weight to be accorded to the testimony of the various witnesses.

Plaintiffs had three experts, who had also testified in one or both of the prior trials in the district court. By stipulation of the parties, specified portions of testimony of Charles R. Moore, Trevor White, and James E. Klapmeier were put in the record, on the basis that their testimony in the instant trial would be the same as their previous testimony in the district court in 1969 and 1970. Counsel for both parties adopted the objections of counsel in the prior proceed-

ings. After a study of these transcripts, the Trial Judge adopted the rulings of Judge Neville on those objections, as reflecting this Court's views.[4]

Defendant's expert witnesses were Peter John Johnson, Jr. and Sydney Gernander. Both testified live, but Mr. Gernander had also testified at the second district court trial and his prior testimony figured in plaintiffs' cross-examination of that witness.

### A. Plaintiffs' witnesses:

#### 1. Charles R. Moore

Mr. Moore, President of C. W. Moore Co., Inc. in Buhl, Minnesota, is a general contractor engaged primarily in the building moving business, and his company is the largest house moving business in the northwestern part of the United States. Mr. Moore visited the premises of Petes' operation, traveling from Ely across Fall Lake and then proceeding across the Portage to the Hoist Bay property, frequently stopping along the way to examine the character of the road and its dimensions. He also carefully examined and measured the barges on site. He testified pertinently and knowledgeably relative to factual issues one and two.

Mr. Moore was a good and credible witness, whose testimony is well founded and is entitled to considerable weight, for he was well qualified, as an experienced general contractor and the president of the most capable building moving company, to express an expert opinion of the transportability issues. Defendant's counsel was unsuccessful in shaking his testimony by cross-examination.

#### 2. Trevor White

Mr. White, Executive Vice President and formerly Director of Engineering for Fraser Shipyards, Inc., Superior, Wisconsin, is a naval engineer trained in Northern Ireland, an internationally known shipbuilding center. For over 10 years, he had been respon-

4. Also, by agreement of the parties and the Court's direction, the full transcripts of the two prior trials became part of the record as joint exhibits.

sible for the final determination of bids, costs, and pricing of his company's shipbuilding products. He studied drawings of the barges, a check list of all items incorporated on the original vessels, and made a complete personal inspection of them, including going on board and examining the interior and exterior of each one in detail.

Mr. White was thus able to give a knowledgeable opinion of the fair market value based on reconstruction costs of the barges by similar construction as of January 19, 1966, documented by full worksheets of the cost items upon which his total figures were based. He also gave opinions on the transportability issues.

Mr. White has impressive technical credentials in the field of naval architecture and naval engineering. He was a fine and credible witness, whose testimony is well founded and is entitled to very great weight as a well qualified expert in the areas in which he was expressing his opinion, nor was his testimony undermined on cross-examination.

### 3. *James E. Klapmeier*

Mr. Klapmeier has been president of Boatel Co., Mora, Minnesota, the largest builder of houseboats in that state, since its founding in 1954. With an assistant, he spent 2 days on location with the barges, carefully observing and measuring every aspect of them. He had design charts and his own records of costs of construction of similar craft, upon which to base his opinion of the cost as of January 19, 1966 of reconstruction of the barges in substantially the same way. He also expressed opinions of the transportability questions.

Mr. Klapmeier's credentials and experience in the boat building field are extensive. His company manufactures houseboats, pontoon boats, and snowmobiles. He

is an M.I.T. graduate, magna cum laude, Phi Beta Kappa, in mechanical engineering, with a Masters in Business Administration from the University of Minnesota. He was a knowledgeable, experienced, excellent, and credible witness. His testimony is well founded and is entitled to very great weight as an exceptionally qualified expert in the areas in which he was expressing his opinion. His testimony was untouched by cross-examination.

### B. Defendant's witnesses:

### 4. *Peter John Johnson, Jr.*

Mr. Johnson,[5] a graduate of Michigan College of Mining Technology, started in the contracting business in 1959 with his father's mining construction business, Johnson & Moore. Later, he organized Hoover Construction Co. in Virginia, Minnesota, as a joint venture with his father's company. His brother, who is not an engineer and 9 years his junior, has since joined the company, while his father retired in 1973. Mr. Johnson's business experience has been almost totally in earth moving and he has not had any experience moving houses or buildings comparable to plaintiffs' barges in size or weight.

As a result of a brief 4-hour visit to the Hoist Bay site and the roads or lakes between there and Ely, Mr. Johnson reached the conclusion that he could successfully remove plaintiffs' barges intact. He made such a representation to the Forest Service in a letter dated August 22, 1974, in which he offered to move the three barges from Basswood Lake to the campground on the western shore of Fall Lake for $18,000 or to move them to Ely for $30,000. This letter gave no details of his proposed plan for accomplishing this objective, although questioning at trial elicited this information. Interrogation by plaintiffs' counsel, how-

---

5. The failure of defendant's counsel to accurately communicate in advance of trial the identity, address, telephone number, and a summary of the views of its expert on transportability to plaintiffs' counsel, prompted the latter to request leave of the Court for the opportunity to take a deposition of Mr. Johnson prior to his trial appearance. The Trial Judge so directed, since defendant's counsel had failed to adhere to a prior directive of the Court, the purpose of which was to insure advance disclosure by both parties of the identity, etc., of witnesses. Mr. Johnson's deposition testimony, as well as his live trial testimony, was made part of the trial record by stipulation of the parties.

ever, revealed that the witness had failed to consider many important factors and known inherent hazards of such a project, which crucially affect his conclusion that the barges were transportable intact.

Clearly, Mr. Johnson was unqualified by education and experience to express a valid and reliable expert opinion on the transportability of the barges. Moreover, his views are entitled to little weight, for they have no valid basis and in reality are valueless.

### 5. Sydney Gernander

Mr. Gernander has been a private marine surveyor in Duluth, Minnesota since mid 1965. In his work, he has surveyed ships relative to the extent and validity of damage claims and also supervised ship repair work on company vessels. For 30 years prior to 1965, he worked for various shipyards or shipbuilding companies as a shipfitter or ship mechanic and a foreman or supervisor of fitters.

Plaintiffs contend[6] that Mr. Gernander's credentials and background do not qualify him as an expert witness, since his background was primarily in the mechanical arts and that he lacked any training or experience in appraisal work. Mr. Gernander admittedly had no formal training as an appraiser, although defendant specifically offered him as a valuation expert. Moreover, he has had no experience with the construction of structures comparable to plaintiffs' barges. For these reasons, the Court determines that he is unqualified to give an expert opinion on valuation and his testimony shall be accorded no weight.

### III.

#### Issue One

As to whether removal of plaintiffs' three cabin barges over land intact was an impossibility, both plaintiffs and defendant offered contradictory testimony at trial. All the evidence, however, clearly confirmed that the only overland means of access to and egress from the plaintiffs' former property on Hoist Bay in Basswood Lake is over a road called the Four Mile Portage (hereafter Portage) between Basswood and Fall Lakes, which lies entirely within the no-cut zone of the BWCA.

The Portage divides into two spurs approximately 1 mile from Basswood Lake. The southern or original route leads to property formerly owned and operated by Frank Hubacheck. The northern route leads to the Petes' former property on Hoist Bay in Basswood Lake and is a hilly, twisting road built during the 1930's and bordered by rock outcroppings. All witnesses testifying at trial about the transportability of the barges agreed that they could not be brought out over the northern spur.

The Portage along the southern spur is a road with a log corduroy base filled with gravel and has soft shoulders. In that portion bordering Muskeg Lake, it is directly flooded during the spring of each season and it runs through low-lying land between a swamp and the bank of a hill, generally following the curvature of the lake. Elsewhere along the Portage, the road passed by and through rock ledges (including in 1966, two narrow cuts) and often was bordered by trees and brush growing adjacent to the road surface.

About 1 mile from the Fall Lake end of the Portage is a narrow wooden bridge, approximately 12 feet in width in 1974 as a result of recent improvements. In 1974, the Portage along this route was about 12½ feet wide throughout most of its course, with the remainder of the road being narrower. In 1966, the road was even more narrow and hence, it was necessary to proceed very slowly along the Portage because vehicles could go off the road and become stuck in adjacent ditches.

Defendant's position that the barges are removable over the southern spur of the Portage is supported by witness Peter John

---

6. The objections of plaintiffs' counsel to the witness's credentials are identical with those lodged by him at the 1970 district court trial.

Johnson, Jr., who submitted a written offer dated August 22, 1974, to the Forest Service to this effect on behalf of his company, as detailed previously in Part II of this opinion. It was determined, also in Part II, that Mr. Johnson was unqualified by technical background and business experience as an expert on the transportability of objects of the size and weight of plaintiffs' barges.[7] As we have previously indicated, Mr. Johnson lacks the knowledge and experience of moving objects of the size, weight, and configuration of plaintiffs' barges. Also, his views are successfully negatived by more knowledgeable persons. Furthermore, his transportability theory overlooks and is contrary to known and not readily surmountable impediments of fact, terrain, weather, nature, etc., enumerated in note 7.

Consequently, his testimony is not only discredited as an expert (as indicated in Part II), but also his view that plaintiffs' three cabin barges can be successfully moved intact from Hoist Bay outside the BWCA is without foundation and entitled to little weight.

Plaintiffs rely on the testimony of Charles Moore, Trevor White, James Klapmeier, Thomas Trambath, B. R. Park, John Richards, Richard Swanson, and plaintiffs, in support of their contention that the in-

---

**7.** We could at this point merely note that his testimony was entitled to little weight and pass on to the testimony of other witnesses on the issue. However, we will briefly give the substance of his testimony on this issue, for it is illustrative and confirmatory of the witness's lack of knowledge of the problems involved in transporting these barges in 1966.

Mr. Johnson testified at trial that he proposed to remove the barges from the water prior to the winter freeze, suspend them in cribbing, and transport them across Basswood Lake after the lake was sufficiently frozen. The witness then had two proposed combinations of equipment which were to be driven beneath the barges and cribbing, with the barges then being lowered onto the equipment by means of 50-ton hydraulic jacks, and thereafter transported entirely by the chosen method.

The first method involved a 60-ton three-axle trailer with a set of dollies pulled by a tridem (three-axle) tractor, with the combined weight of approximately 15 tons. The alternative method was to make a sleigh out of 12-inch I-beams pulled by a heavy grader or blade, with the combined weight of 35 tons. Mr. Johnson's proposal then called for the vessels to be drawn by one of the two alternative combinations of equipment across 1,500 feet of frozen ice on Hoist Bay.

In order to get the barges from the lake onto the southern spur of the Portage, Mr. Johnson proposed to cut a 75-foot road behind the Hubacheck cabins by removing hazel bush from the surface of the muskeg ground. Then, according to the witness's testimony, the barges could be moved over the southern spur and the main part of the Portage, placed back on Fall Lake, propelled across that lake, beached at the Fall Lake Campground, and thence transported by road to Ely.

A study of the evidence reveals that Mr. Johnson's testimony is incorrect in several respects. First, the record shows that there were no three-axle tractors available in Minnesota in January 1966. Second, while Mr. Johnson proposes to cut hazel bush and trees along the Portage, he fails to explain satisfactorily how this can be accomplished in an area, which is by law a no-cut zone. Third, he proposes the impractical and unworkable solution of bringing heavy barges out of the water onto a road newly laid over muskeg, a marshy bog, which is singularly lacking in supportive qualities. Fourth, the bridge on the Portage as it existed in 1966 would not support the weight nor accommodate the width of the barges. Fifth, although the southern spur was more easily traversed with equipment than plaintiffs' northern spur in 1966, the remainder or main part of the Portage was much narrower than the width of the barges. Sixth, testimony, by plaintiffs' witnesses attested to the difficulties of transporting such heavy equipment over frozen lakes and the dangers of such an undertaking, frequently leading to men and equipment being lost or damaged going through the ice, which the witness has failed to discount or even satisfactorily explain.

Testimony and evidence at trial clearly demonstrated that the transportation of heavy equipment over frozen lakes is a hazardous undertaking for the following reasons: (1) there is no guarantee that the ice is of uniform thickness; (2) even when 100-foot swaths are plowed across the ice, stress points and faults remain; (3) the movement of heavy machinery over the ice generates a wave of water beneath the ice traveling in the same direction and when this wave reaches the shoreline, it is compressed against the ice, which frequently causes the ice to crack; (4) much of the bottom of Hoist Bay on Basswood Lake is muskeg, which generates heat as it decomposes, and the thickness and supportive capacity of the ice in such areas is less; and (5) the ice on Fall Lake is considered unpredictable as a result of the confluence of the Shagawa River and streams from Birch, Gabbro, and Stump Lakes.

surmountable difficulties involved in attempting to move the barges over even the southern spur of the Portage intact rendered removal an impossibility. In Part II, it was determined that Messrs. Moore, White, and Klapmeier were qualified by education and experience as experts in the area of transportability of property such as plaintiffs' barges. The other witnesses offered by plaintiff are familiar with the geographical area, as well as the barges, and are factual rather than expert witnesses.

During his entire business life, Charles R. Moore has been employed as a general contractor engaged primarily in moving and relocation of all types of structures (houses, buildings, etc.). Indeed, his company, C. W. Moore Company, Inc., is the largest building moving concern in the northwestern part of the United States. Mr. Moore made a meticulous and detailed investigation of the route from Ely to Hoist Bay, especially on the Portage, where he frequently stopped to examine the character of the road and its dimensions. The witness testified that the road was so narrow that it would not accommodate the width of plaintiffs' three barges over the road and the road would have to be widened by blasting, for there was either rock on each side of the road or narrow cuts with high banks. Additionally, he pointed out that in several places the road was very swampy and soft. Also, there was a bridge which would never hold the weight of the barges. Finally, he concluded that the barges could not be moved practicably and reasonably from Hoist Bay outside the BWCA over land without disassembling them.

Mr. Trevor White, a naval engineer employed by Fraser Shipyards in Superior, Wisconsin who had impressive and extensive qualifications in the field of naval architecture, was asked his opinion as to whether the barges could be transported over land without severely and seriously damaging their unitary integrity (*i.e.*, their structures as a whole). He testified that it would be impossible to move vessels of the size under discussion in their entirety from their location at Basswood Lake over land. In order to move those vessels, he felt it would be necessary to cut them apart to reduce their overall size to make them transportable.

Mr. James E. Klapmeier, President of Boatel Company, Inc., expressed an opinion as to the movability of the boats intact over land. Mr. Klapmeier's credentials and experience in the boat building business were substantial. As to whether the three barges could practicably and reasonably be transported out of Hoist Bay to another location outside of the BWCA over land, because of the vessels' measurements and the materials from which and manner in which the barges were constructed, he felt the physical difficulties would be such that the practical cost of dismantling the barges in order to reassemble them again at some other place would be a higher cost than the construction cost new at that particular site. Therefore, he concluded it was impractical as a purely physical matter.

Plaintiffs presented additional testimony by witnesses from the Ely area, who were familiar with the barges, lakes, and Portage. Since this evidence is corroborative and cumulative, the details will be omitted, but a brief summary is noted below.[8] Be-

---

**8.** Plaintiffs also presented testimony of three witnesses, who were natives of Ely and familiar with the area, especially the Portage: R. Thomas Trembath, B. R. Park, and John Richards. The substance of the testimony of Messrs. Trembath and Park were offered under stipulation of the parties, while Mr. Richards' testimony was live.

Mr. Trembath is the owner of Welding & Machine Works. Mr. Park is a contractor, who has moved buildings and other sizeable structures. Mr. Richards, an employee of the St. Louis Equipment Co., had been in the construc-

tion business for 25 years and had moved buildings. All three witnesses, as well as both plaintiffs, corroborated the views of Messrs. Moore, White and Klapmeier that the barges were not transportable. Mr. Richards said that he knew of no one in the area in 1966 with the equipment required to move the barges over land.

Moreover, defendant's witness, Joseph Kerntz, a native of the Ely area for 71 years, who had worked for Mr. Hubacheck at Basswood Lake since 1938, acknowledged that it was impractical, if not impossible, to seek to

cause of the familiarity of witnesses Messrs. Trembath, Park, Richards, and Kerntz with local conditions and plaintiffs' barges over a considerable period of time, their corroborative factual testimony is entitled to weight, although less weight than that accorded to plaintiffs' three expert witnesses.

The cumulative weight of the credible and unrebutted evidence of record leads the Court to the conclusion that because of the size, weight and configuration of the vessels, the lack of equipment capable of carrying the vessels in 1966, the character and dimensions of the Portage along its southern spur in 1966, and the treacherous, unpredictable nature of the ice on Basswood and Fall Lakes, it was not possible to transport the vessels out of the BWCA intact in January of 1966 and the Court so holds.[9]

## IV.

### Issue Two

As to whether it was technically and physically possible to cut the barges apart by blowtorch, transport the parts out of the BWCA, and weld them back at another location, plaintiffs presented testimony of its three expert witnesses, Messrs. Moore, White, and Klapmeier, all of whom were previously found to be well qualified to express opinions on this question.

Mr. Moore testified that the barges were not designed to be moved and in order to move them over the Portage, they would have to be disassembled, unless the road

was widened. He said he did not see how these barges could be disassembled and still be kept in the same shape. After examining the barges and the route, his conclusion was that the barges could not be moved practicably and reasonably from the Hoist Bay area outside the BWCA.

When asked whether the barges could be transported over the Portage without severely and seriously damaging their unitary integrity or their structures as a whole, Mr. White said it would be impossible to move vessels of the size under discussion in their entirety from their location at Basswood Lake over land. He felt it would be necessary to cut them apart, to reduce their overall size and to make them transportable, but by so doing, the barges would lose their shape to such an extent that it would be impossible to rejoin the vessels as they were originally. While prior to cutting apart, sufficient provision could be made for the vessels to retain their shape, but the witness felt this would involve more money than would be justified.

Mr. Klapmeier testified that the physical difficulties involved would be such that the practical cost of dismantling the barge in order to assemble it again at another place would be a higher cost than the construction cost new at the particular site and, therefore, he felt it was impractical as a purely physical undertaking.

Plaintiffs offered additional corroborative testimony by both Petes, Mr. Trembath, and Mr. Park.

---

transport the vessels out of Basswood Lake over the Portage intact. He had personally been involved in moving structures across the Portage, and he said it would be impractical and foolhardy for anyone to undertake to transport a load of 35 tons, in conjunction with 35 tons of equipment, from the end of the Portage to the public campgrounds on Fall Lake. He also said he believed that anyone who attempted to transport that much weight across the ice would face the certain loss of his equipment and the load. Mr. Kerntz further stated that it was only with great difficulty that he was able to move much smaller and lighter structures than plaintiffs' barges across the Portage and those structures were damaged in transit.

Furthermore, witnesses John Richards and Richard Swanson (a contractor and resident of

Ely, familiar with the area in question, the substance of whose testimony was offered by stipulation) were of the opinion that the vessels could not be transported across the frozen surface of Basswood and Fall Lakes. To do so, they felt, would risk almost certain loss of equipment, damage to or loss of the vessels, and possible injury or death to those involved. Indeed, according to Mr. Richards, the only person in the vicinity engaged in transporting structures and equipment across the frozen lakes in 1966, it was considered so hazardous it was not even an insurable risk.

9. Judge Neville reached a similar conclusion after seeing the Portage first-hand during the first district court trial. *United States v. 967.-905 Acres of Land, supra* note 2, at 86.

Mr. Trembath, an experienced welder authorized to do work on vessels certified by the Coast Guard, indicated that in attempting to disassemble the vessels, before any cutting of steel hulls could begin, the entire superstructure on each vessel would have to be removed; next, the dry dock facilities at the Petes' former property would have to be enlarged in order to facilitate the loading of the hull sections on truck-trailer combinations; and the tremendous heat used to cut the steel hulls would cause warpage of the steel, with reassembly of the hull being extremely difficult. He also indicated that with respect to the Russell Lee, cutting the steel hull would be absolutely impossible, because the steel shell surrounds the original wooden barge hull. Mr. Trembath's conclusion was that disassembling and reassembling the barges would be an extraordinarily expensive and impractical undertaking.

Mr. Park, a carpenter by trade, stated that the principal problem presented was that the walls of the superstructures were anchored to steel plates welded to the deck of each vessel and their were no wood joists or other support to hold the superstructure together after removal from the hull. Therefore, he felt it would be necessary to completely disassemble each superstructure board by board and then literally rebuild it all over again. Consequently, Mr. Park was of the opinion that it would be easier, better, and less expensive to build an entirely new superstructure for each vessel than to attempt to remove, transport, and reconstruct the existing superstructure.

 Therefore, in view of the weight of credible and unrebutted evidence indicating that the necessity of enlarging the existing dry dock facilities, the warpage of the steel hulls which would result from cutting them apart, the unique problems posed by the hull of the Russell Lee, and the type of superstructure construction on each of the vessels, the disassembly, transportation, and reconstruction of the vessels outside the

BWCA, would be both physically and technically impractical, if not altogether impossible, and the Court so holds.[10]

## · V.

### Issue Three

As to the valuation of plaintiffs' three cabin barges, of whose use plaintiffs have been deprived, both parties have submitted expert testimony. Plaintiffs' experts, Messrs. White and Klapmeier, gave their opinions on the fair market value as of January 19, 1966, based on reconstruction costs, less depreciation.

As determined in Part II, defendant's expert witness, Mr. Gernander, is totally unqualified as an expert on valuation, on the basis of his lack of appraisal credentials. Moreover, his method of valuation was equally objectionable to plaintiffs.

Mr. Gernander briefly visited the barges immediately prior to the second district court trial and he made a determination of fair market value as of June 15, 1970. Then, he arrived at a valuation figure as of January 19, 1966 by adding back 16 percent as the estimated depreciation for the period between those dates. No authority was offered to support the use of this approach, which constitutes an inaccurate, distorted, and unacceptable method of valuation. Depreciation must be subtracted from the original value in order to arrive at the fair market value as of a certain date, not the converse.

By his own admission, Mr. Gernander did not rely upon any comparables, since he did not believe any existed. Nor did he reply upon an income approach in appraising the subject property. Additionally, Mr. Gernander's present testimony inexplicably contradicted his 1970 testimony in that he attributed a 25-year life to the barges in this proceeding, whereas in the 1970 trial, he set the useful life of the barges at 50, 60, and 70 years, respectively. Moreover, the witness incorrectly relied on information

---

**10.** For Judge Neville's like determination, *see United States v. 967.905 Acres of Land, supra* note 2, at 87.

supplied by another person (a surveyor) relative to the barges, without personally verifying all the information. Furthermore, he had absolutely no experience with either the operation or construction of cabin barges or vessels similar to the barges in question here.

Mr. Gernander's fair market value figures as of January 19, 1966 for the three barges were as follows: Jacob L., $18,385; Russell Lee, $25,250; and Gail Adena, $25,500, arrived at from 1970 reconstruction costs of $15,750; $20,250; and $21,500, respectively. These figures represented reconstruction costs at a shipyard, not at Hoist Bay, where it would have been more expensive.

This witness's testimony is lacking in foundation primarily, because Mr. Gernander failed to conduct a sufficient personal investigation of all the factual aspects pertinent to the barges and their construction, especially in relation to the crucial valuation date of January 19, 1966. There are, of course, the additional adverse aspects of his testimony, mentioned above. Accordingly, the Court holds that his testimony about the fair market value of the barges as of January 19, 1966 shall be accorded no weight.[11]

Mr. White's appraisal at plaintiffs' request was based on a review of the design and plans of plaintiffs' three barges from the files of Fraser Shipyards, together with his personal inspection of the vessels, including a review of the condition of the barge hulls, interior and exterior of the houses, as well as all the structures and accommodations on the barges. Mr. White testified that he arrived at reconstruction costs of the vessels as of January 19, 1966 by examining the barges minutely and checking in detail the various drawings pertaining to each vessel. Then, based on his survey and the drawings he made a complete, detailed estimate of the necessary labor and material, which would be necessary to duplicate the three barges and then costed them out. Mr. White testified that

he considered the barges to be in good condition, for they showed signs of considerable care throughout their life. He estimated that the useful life of the cabin barges would possibly exceed 70 years and that as of January 19, 1966, the extent of depreciation of the barges was 10 percent from new vessel construction.

In view of all these considerations, Mr. White gave barge reconstruction costs as of January 19, 1966 as follows: Jacob L., $53,300; Russell Lee, $58,500; and Gail Adena, $55,660. Since Mr. White believed that the fair and reasonable market value of each barge on that date was the above reconstruction cost figures less 10 percent, his valuation of the barges was: Jacob L., $47,970; Russell Lee, $52,650; and Gail Adena, $50,094.

The subject property was also appraised by Mr. James Klapmeier at the request of plaintiffs. Mr. Klapmeier, together with another member of the Boatel Company, made a personal on-site inspection of the subject property for a period of 2 days, at which time he examined all the component parts of all the boats that were there, took measurements, made the type of testing and appraisal which was usually done when he examined houseboats, went into all of the hold compartments, and looked at every structural and mechanical component of each of these units. On that basis, Mr. Klapmeier undertook to ascertain the reconstruction cost of the vessels new as of January 19, 1966.

In order to arrive at a figure, Mr. Klapmeier used the following procedure: Since the appraisal was made in November 1966, he had to look at his company's cost records to see what increases there had been in materials, components, and labor, since January 19, 1966. He said this was quite easy to do, since his company was in the day-to-day business of construction of houseboats. Based on his company's experience, he could come up with cost figures which he would have bid on such a project in January of 1966.

---

11. *Garstin v. United States,* 352 F.2d 537, 173 Ct.Cl. 550 (1965), and cases cited therein.

Mr. Klapmeier testified that it was probable that plaintiffs' three cabin barges could last at least 150 years, if the degree of care and maintenance they had previously received had continued. He concluded that the extent of depreciation between a brand new boat and the condition of the boats as of January 19, 1966 was 10 percent.

As a result, Mr. Klapmeier arrived at the following reconstruction costs as of January 19, 1966: Jacob L., $52,000; Russell Lee, $60,000; and Gail Adena, $58,000. Since Mr. Klapmeier's opinion of the fair and reasonable market value of plaintiffs' cabin barges as of January 19, 1966, was 90 percent of the replacement cost, his valuation of the barges was: Jacob L., $46,800; Russell Lee, $54,000; and Gail Adena, $52,200.

■ While both Mr. White and Mr. Klapmeier have excellent credentials as experts, the Court accords more weight to Mr. Klapmeier's opinion and testimony, because his company has specialized in construction of structures similar to plaintiffs' barges, he and his assistant spent 2 days meticulously examining every aspect of the barges on site, and he had available to him actual cost figures for the various components necessary for the reconstruction of plaintiffs' three cabin barges. Mr. Klapmeier's figures were clearly and specifically tailored to the exact specifications of the three barges as of January 19, 1966 and are considered more cost exact. Both Mr. White and Mr. Klapmeier are credible witnesses, but for the above reasons the testimony and valuation figures of Mr. Klapmeier are accorded more weight by the Court.

### VI.

*Issue Four*

Having resolved the factual questions, the Court must now decide whether defendant's action pursuant to regulations of the Department of Agriculture, banning the use within the BWCA of plaintiffs' three floating motor powered barges as living quarters, for transportation and other commercial purposes, constitutes a compensable taking under the Fifth Amendment and 28 U.S.C. § 1491 (Supp. III, 1973). In determining the measure of just compensation, the Supreme Court stated in *United States v. Virginia Electric & Power Co.*, 365 U.S. 624, 633, 81 S.Ct. 784, 790, 5 L.Ed.2d 838, 847 (1961), that:

> The guiding principle of just compensation is reimbursement to the owner for the property interest taken. "He is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more." *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236. In many cases this principle can readily be served by the ascertainment of fair market value—"what a willing buyer would pay in cash to a willing seller." *United States v. Miller*, 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336. See *United States v. Commodities Corp.*, 339 U.S. 121, 123, 70 S.Ct. 547, 94 L.Ed. 707; *United States v. Cors*, 337 U.S. 325, 333, 69 S.Ct. 1086, 93 L.Ed. 1392. But this is not an absolute standard nor an exclusive method of valuation.[12]

■ The essential question is always what has the owner lost,[13] with the owner's indemnity being measured in different ways depending on the circumstances in each case.[14] Ascertainment of value is reached, according to the Supreme Court, by a reasonable judgment of the Court

---

12. *See also United States v. Fuller*, 409 U.S. 488, 490–91, 93 S.Ct. 801, 803, 35 L.Ed.2d 16, 19–20 (1973).

13. *United States v. Virginia Electric & Power Co.*, 365 U.S. 624, 635, 81 S.Ct. 784, 791, 5 L.Ed.2d 838, 848 (1961); *United States v. Causby*, 328 U.S. 256, 261, 66 S.Ct. 1062, 1065, 90 L.Ed. 1206, 1210 (1946).

14. *United States v. Miller*, 317 U.S. 369, 373–74, 63 S.Ct. 276, 279–80, 87 L.Ed. 336–342 (1943); *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123, 70 S.Ct. 547, 549, 94 L.Ed. 707, 711 (1950).

based on its consideration of all relevant facts.[15]

Plaintiffs' three cabin barges are custom-made vessels and clearly unique personal property, for they are larger in all dimensions, heavier, more strongly constructed, more durable, etc., than ordinary barges, houseboats, or other motor powered boats suitable for overnight inland water travel.[16] Hence, there is no ready or actual market with comparable sales figures to provide a yardstick of fair market value. There are, however, other reliable methods by which fair market value may be determined. For example, reproduction (*i.e.,* reconstruction or replacement) costs, less depreciation, the method to which both plaintiffs' and defendant's experts addressed themselves.[17]

The reproduction cost less depreciation approach, used by both parties and all the valuation witnesses, is a valid method of determining fair market value and one particularly well adapted to use under the circumstances of the case.[18] Based on all relevant facts in the record and especially on the Court's determinations as to the credibility of the valuation witnesses,[19] we conclude that it is the best standard of value under the circumstances of the facts of the instant case.

Before discussing the legal taking aspect of the case, let us consider the date on which plaintiffs' barges were taken, plaintiffs' position is that January 19, 1966, the date condemnation proceedings were commenced against plaintiffs' realty is the proper date. Defendant during this proceeding has also mentioned two other possible dates: December 21, 1965, when the federal regulation prohibiting commercial enterprises in the BWCA (36 C.F.R. § 251.85 (1966)) was promulgated and an unspecified date in 1969, when plaintiffs last used the barges.

Property is legally taken when the taking directly interferes with or substantially disturbs the owner's use and enjoyment of the property.[20] The parties may, of course, agree on a date for valuation purposes, but this date will not be adopted as the proper date, unless it is reasonable in the context of the circumstances and supported by proof. In *Drakes Bay Land Co. v. United States,* 510–11, 459 F.2d 504, 505–6, 198 Ct.Cl. 506 (1972), for purposes of value, it was the day the Government bought the only access to the owner's planned development, the date stipulated by the parties.

The date of promulgation of the regulations prohibiting commercial enterprises, such as plaintiffs operated, and specifically prohibiting plaintiffs' floating motor powered cabin barges was December 21, 1965. This, however, was not the date of the

**15.** *Standard Oil Co. v. Southern Pac. Co.,* 268 U.S. 146, 150, 45 S.Ct. 465, 69 L.Ed. 890 (1925).

**16.** The type of custom design and construction methods used in plaintiffs' barges are not in anyway obsolete, according to testimony at trial of Messrs. White and Klapmeier. These witnesses said they would reconstruct the barges in substantially the same way, but any new construction would naturally incorporate any recent developments in construction methods, for no one ever reproduces anything in a totally identical way, especially if the item has had construction added after its original assembly, as occurred here. Also, the requirements of a location other than Fall Lake could necessitate minor variations in the original construction plans of the barges. *United States v. Toronto, Hamilton & Buffalo Navigation Co.,* 338 U.S. 396, 403 n. 5, 70 S.Ct. 217, 221, 94 L.Ed. 195, 201 (1949).

**17.** Original cost is generally not considered a fair measure of current value. *United States v. Toronto, Hamilton & Buffalo Navigation Co., supra* note 16, at 403, 70 S.Ct. at 221, 94 L.Ed. at 201.

**18.** *Standard Oil Co. v. Southern Pac. Co., supra* note 15, at 156, 45 S.Ct. at 467, 69 L.Ed. at 895.

**19.** Defendant's expert was found to be unqualified and his conclusions to be without foundation. Plaintiffs' experts, Messrs. White and Klapmeier were both found to be well qualified, but the latter's opinion and testimony was accorded more weight, because his figures were considered to be more cost exact. See Part V of this opinion. *See also Toronto, Hamilton & Buffalo Navigation Co. v. United States,* 88 F.Supp. 1016, 1022, 116 Ct.Cl. 184, 208 (1950).

**20.** *R. J. Widen Co. v. United States,* 357 F.2d 988, 993, 174 Ct.Cl. 1020, 1027 (1966).

taking of plaintiffs' barges, for the regulation [21] and its underlying statute [22] provided that the Government's action was subject to existing private property rights, which were not extinguished automatically as of that date. Rather, additional governmental action by contractual agreement or condemnation proceedings was contemplated and necessary to complete its ownership and control of the BWCA.[23]

Defendant's argument for a date in 1969, when plaintiffs ceased using the barges, as a taking date,[24] lacks certainty, for defendant throughout this proceeding has left this date in 1969 unspecified and offered no proof of value as of 1969.[25] We conclude that this argument lacks foundation.

The filing of the declaration of taking on January 19, 1966 covering plaintiffs' real estate was the first substantial interference with plaintiffs' use and enjoyment of the barges. Plaintiffs' use of their barges was directly dependent upon the real estate owned by plaintiffs, their property bordering on Hoist Bay in Basswood Lake. Without a place to dock the three cabin barges for boarding and discharge of passengers, hunters, fishermen, and sightseers, as well as a base of operations for purposes of refueling and maintenance, plaintiffs could not fully utilize their floating, motorized property.

Also reinforcing January 19, 1966 as the taking date, the record shows that plaintiffs had only limited use of the barges between that date and the day in 1969, when they ceased operations and departed from their Hoist Bay property, because of the cloud of condemnation. *Drakes Bay Land Co. v. United States, supra.* Thus, the date of taking of plaintiffs' three cabin barges was January 19, 1966. *Daily v. United States,* 90 F.Supp. 699, 702–3, 116 Ct.Cl. 723, 733–34 (1950).

With regard to whether plaintiffs' barges were legally taken by defendant, this Court said in *Eyherabide v. United States,* 345 F.2d 565, 567, 170 Ct.Cl. 598, 601 (1965):

Federal law recognizes that, although there may be no official intention to acquire any property interest, certain governmental actions entail such an actual invasion of private property rights that a constitutional taking must be implied. * * * The interference with use or possession may be so substantial and of such a character that it cannot be done without compensation under the Federal Government's regulatory and executive powers. Where these factors exist and a constitutional taking is implied, it is assumed that the United States has acquired a definite interest in the property, permanent or temporary, such as fee ti-

---

**21.** 36 C.F.R. § 251.85 (1967), now 36 C.F.R. § 293.16 (1974), provided that:

"(b) Except as provided in the Wilderness Act, in this section and in §§ 294.2(b), (c) and (e), and subject to existing private rights, there shall be no commercial enterprises and no permanent roads within the Boundary Waters Canoe Area and there shall be no temporary roads, no use of motor vehicles, motorized equipment, or motorboats, no landing of aircraft, and no other form of mechanical transport."

**22.** 16 U.S.C. § 1133(c) (1964). For scope of statute, see Part I of this opinion.

**23.** Defendant suggests that if December 21, 1965 is the date of taking, plaintiffs are barred from recovery by the statute of limitations. At trial, no proof was presented relative to December 21, 1965 as the date of taking. Defendant, however, stated that even though it does not support that date as the time of the taking, the statute of limitations in the Tucker Act prevents recovery, since more than 6 years

elapsed between December 21, 1965 and the filing of this action on January 13, 1972. In view of our conclusion above that December 21, 1965 is not the date of taking, there is no need to pass on this argument. However, defendant's introduction of the 1965 date, for purposes of interjecting the statute of limitations argument, while contending that a date in 1969 is the correct date for purposes of valuation, is illogical and unsupported by authority.

**24.** An alternate date of taking was only interposed by defendant during cross-examination of plaintiff James on the second day of the trial. In pretrial submissions and conferences, defendant had assented to January 19, 1966 as the taking date.

**25.** Defendant's valuation witness gave barge valuations as of January 1966 and June 1970, but not as of any date in 1969. See Part V of this opinion.

tle, an easement, a servitude, or a leasehold. [Citations omitted][26]

Defendant maintains that any loss of the use and enjoyment of the three cabin barges is attributable to the loss of customers by the plaintiffs resulting from the creation of the BWCA, rather than a taking by the Federal Government, and thus the loss is an unintended incident of the Government's activity, citing *Southern Counties Gas Co. v. United States,* 157 F.Supp. 934, 141 Ct.Cl. 28, *cert. denied,* 358 U.S. 815, 79 S.Ct. 23, 3 L.Ed.2d 58 (1958).

Plaintiff, a public service utility company supplying gas to domestic, industrial, and commercial customers in southern California, brought suit to recover damage allegedly suffered by reason of the Government's taking of land in connection with a flood control project, because its facilities were installed and maintained under easements from private owners and rights-of-way granted by two southern California counties and owners of property serviced. The United States did not expressly acquire the company's rights by condemnation. Rather the United States prohibited human habitation in the taking area and raised or removed all structures therein except for certain industrial structures, which were to be raised or buttressed against the maximum possible water elevation. The cost of removing the plaintiffs' facilities under ground would have exceeded their salvage value and would have resulted in a total loss to the company. This Court held that the Government's activity was not a taking of the company's properties within the meaning of the Fifth Amendment, for the loss was due to the project and constituted an indirect, unintended incident of the taking and hence a consequent and noncompensable loss.

This decision, however, is distinguishable both factually and legally. Plaintiffs in the instant case were the owners of real property, which was indisputably taken by the Federal Government in connection with the creation of the BWCA. The subject property in dispute in this litigation was an integral part of the real property which was taken.[27] Therefore, this was not a case of a citizen seeking to recover damages for the appropriation of the property of another. Moreover, the record in this case establishes that it is not physically possible to remove the vessels over land intact. Nor is it possible to disassemble the vessels, transport them elsewhere, and subsequently reassemble them without effectively destroying the vessels as they presently exist. Although in the cited case, the cost of removing the utility's underground facilities would have exceeded the amount that could be obtained for them as salvage, it nevertheless remained possible to physically remove the property without its complete destruction.

Furthermore, while it is clear that the loss to the utility company in the cited case was the consequence of the removal of its customers, in the instant case, plaintiffs' former customers and the public generally continued to use Basswood Lake and the BWCA. The only difference is that plaintiffs are no longer permitted to use and operate their property in the BWCA. Therefore, the loss of the use and value of the property is not due to the removal of plaintiffs' customers, but instead is attributable to plaintiffs' inability to use their property.

Lastly, and perhaps most importantly, the cited case is distinguishable in that the loss to plaintiffs of the use and enjoyment of their property is not an unintended incident of the taking of the land. Indeed, the Government's intentions in promulgating

---

**26.** *See also Aris Gloves, Inc. v. United States,* 420 F.2d 1386, 1391, 190 Ct.Cl. 367, 374 (1970), wherein it was stated:

"This Court will readily concede that it was not necessary for the defendant to have actually taken physical possession of the plaintiffs' property in order for there to have been a fifth amendment taking. A taking can occur simply

when the Government by its action deprives the owner of all or most of his interest in his property."

**27.** Compensation for the three vessels could also be readily justified as a severance damage. *United States v. Grizzard,* 219 U.S. 180, 185–86, 31 S.Ct. 162, 164, 155 L.Ed. 165, 166 (1911).

the Secretary's regulations, 36 C.F.R. § 251.85(b) (1967), was very clearly to prevent plaintiffs, and others like them, from continuing to operate commercial enterprises in the BWCA. This is also illustrated by the verbiage of the regulations, particularly 36 C.F.R. § 251.85(b)(6) (1967), which must certainly have been drafted with plaintiffs' operation in mind, since it provides that:

No amphibious craft of any type and *no water craft designed for or used as floating living quarters* shall be moored to, used on, or transported over National Forest land. [Emphasis supplied.]

The Government's intention to prevent plaintiffs from continuing to operate is additionally reflected in the statement of the Secretary of Agriculture in promulgating the aforementioned regulations, for the Secretary stated that it was necessary to prohibit the storing of boats on National Forest land when they are not used on a current visit basis in order to preserve the primitive condition of the canoe area. Consequently, the decision in *Southern Counties Gas Co. v. United States, supra,* is wholly inapplicable to the instant case and the loss suffered by plaintiffs is not in any way unintended or unforeseeable damage.[28]

■ Whether the governmental activity complained of has so interfered with an individual's use and enjoyment of his property as to warrant compensation must necessarily turn upon the particular circumstances presented. Additionally, the type of taking which entitles the property owner to compensation under the Fifth Amendment is not limited to any set classification or category of governmental interference.[29] For example, destruction of all uses of property by flooding has been held to constitute a taking.[30] Interference with an owner's use and enjoyment of his property by virtue of military or commercial overflights has likewise been held to be a compensable taking.[31] The denial of access to an owner's property has similarly been held to be a compensable taking.[32] Interference with property by virtue of governmental activity on the owner's land, as well as adjoining land, has also been held to constitute a compensable taking.[33]

■ When the effect of a governmental regulation on a citizen's property is so pervasive that the property is greatly depreciated in value or that the owner's right to use the property is substantially interfered with, the citizen is entitled to compensation. In *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322, 325 (1922), Justice Holmes, speaking for the majority, observed:

The general rule at least, is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. * * * We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change.

Moreover, defendant is equally obligated to compensate owners of both realty and personal property legally taken.[34]

**28.** *Campbell v. United States,* 266 U.S. 368, 45 S.Ct. 115, 69, L.Ed. 328 (1924); *R. J. Widen Co. v. United States,* 357 F.2d 988, 174 Ct.Cl. 1020 (1966); *B. Amusement Co. v. United States,* 180 F.Supp. 386, 148 Ct.Cl. 337 (1960).

**29.** *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed. 1228, 1236 (1958); *Kansas City Life Ins. Co. v. United States,* 74 F.Supp. 653, 109 Ct.Cl. 555 (1947), aff'd 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950).

**30.** *United States v. Lynah,* 188 U.S. 445 (1903).

**31.** *Griggs v. Allegheny County,* 369 U.S. 84, 23 S.Ct. 349, 47 L.Ed. 539 (1962).

**32.** *United States v. Welch,* 217 U.S. 333, 30 S.Ct. 527, 54 L.Ed. 787 (1910).

**33.** *Eyherabide v. United States,* 345 F.2d 565, 170 Ct.Cl. 598 (1965).

**34.** *United States v. General Motors Corp.,* 323 U.S. 373, 383, 65 S.Ct. 357, 361, 89 L.Ed. 311, 321 (1945) (fixtures and permanent equipment destroyed or depreciated in a temporary taking); *United States v. Klamath & Moadoc Tribes,* 304 U.S. 119, 122–23, 58 S.Ct. 799, 801, 82 L.Ed. 1219, 1222 (1938) (standing timber); *Porter v. United States,* 473 F.2d 1329, 1335–36 (5th Cir. 1973) (Oswald papers); *King v. United States,* 427 F.2d 767, 769, 192 Ct.Cl. 548, 552 (1970) (flooded crops); *Eyherabide v. United*

The United States condemned all land surrounding Basswood Lake and prohibited the use of gasoline powered engines on the lake. Plaintiffs cannot land their boats on shore for purposes of repair or storage, nor can they utilize engines to propel the boats, nor can they use the boats for any commercially advantageous purpose. The utility of the boats as property has been effectively destroyed, for the right to drift aimlessly in a landlocked lake is the equivalent of no right at all. Removal is impossible.

In the instant case, plaintiffs' use of the three vessels in issue has been precluded altogether, for the vessels can no longer be used for any purpose within the BWCA. The barges can no longer be moored to BWCA land, used on BWCA lakes, or transported over the National Forest area, including the entire shoreline of Basswood Lake. Hence, plaintiffs no longer have access to or the use of their property within the BWCA.

This interference with plaintiffs' exercise of their property rights in the three barges was a foreseeable consequence of a deliberately conceived governmental program, as evidenced by: the public statement of the Department of Agriculture promulgating these regulations;[35] the issuance of the regulations (36 C.F.R. § 251.85 (1967)); and statements of the Secretary in correspondence in early 1969.[36] *See also Bydlon v.*

*United States,* 175 F.Supp. 891, 146 Ct.Cl. 764 (1959), in which the Petes, as parties to that action, were not permitted to recover because the then existing means of access, the Government-owned Portage, was not so inconvenient as to give the Petes a way of necessity by air, even though the deprivation of access by air caused a loss in the market value of their resort. The Government had promised in that action that the Portage would remain available to everyone for vehicular traffic so long as it is needed. This promise, of course, was violated and abrogated with the promulgation of 36 C.F.R. § 251.85 (1967). Even more importantly, the Government admitted in the course of that litigation that it intended to cut off all commercial activity in the BWCA as part of its deliberate advance planning. Plaintiffs were, moreover, one of the known and foreseen targets of defendant's program.

Consequently, the vessels have been rendered useless and their value has been totally destroyed by the Government's activity in creating and administrating the BWCA.[37] Governmental action which interferes so extensively with an owner's rights in his property constitutes a substantial, direct and immediate interference with plaintiffs' use and enjoyment of the boats, and is, therefore, a taking within the meaning of the Fifth Amendment.[38]

*States, supra* note 33, at 607, 345 F.2d at 570–71 (1965) (target practice damage); *Daily v. United States,* 90 F.Supp. 699, 702–3, 116 Ct.Cl. 723, 733–34 (1950) (crops).

**35.** Public statement of the Secretary of Agriculture on December 16, 1965, announcing the resource management program to be followed in administering the BWCA.

**36.** Correspondence in February-April 1969 between John A. Smrekar, President of the Northern Great Lakes Area Council and the Secretary of Agriculture reveals that defendant had a well defined policy and program for the BWCA, whereby it purchased hundreds of properties, including numerous resorts and summer cabins; that plaintiffs' use of cabin barges was inconsistent with the program and therefore plaintiffs' operation had to be eliminated; and that under this program, use of the BWCA would be restricted to 2 months rather than the 12 months of use as in the past. This

program is particularly well revealed in the Secretary's letter of April 7, 1969 to Mr. Smrekar.

**37.** See observations of Judge Neville, *United States v. 967.905 Acres of Land, supra* note 2, at 92. Plaintiffs' excellent demonstrative evidence (maps, aerial and other photographs) was most helpful to the Court, giving it a better understanding of the BWCA and especially Fall and Basswood Lakes and the Portage.

**38.** Defendant's refusal to compensate plaintiffs for their barges also constituted selective and unequal, as well as inappropriate, treatment of owners of vessels on Basswood Lake in January 1966, for Mr. Kerntz, who was defendant's witness, testified that the Forestry Service bought a pontoon houseboat, kept on Basswood Lake and moored off Pete's landing, from its owner for the Service's own use; that he (Kerntz) was hired to move the pontoon boat in

Since it is well established that just compensation under the Fifth Amendment means that the owner is entitled to the fair market value of the property at the time of taking,[39] which in this instance the Court has determined to be the reconstruction or reproduction costs of plaintiffs' three barges (as determined by Mr. Klapmeier) less depreciation,[40] the Court holds that the fair market value of plaintiffs' three cabin barges as of January 19, 1966 was:

| | |
|---|---|
| Jacob L _ _ _ _ _ _ _ _ _ _ _ | $46,800 |
| Russell Lee _ _ _ _ _ _ _ _ | 54,000 |
| Gail Adena _ _ _ _ _ _ _ _ _ | 52,200 |
| Total _ _ _ _ _ _ _ _ _ _ _ | [41] $153,000 |

Plaintiffs in their petition have also requested interest and costs. Pursuant to the Court's holding that plaintiffs are entitled to a particular amount ($153,000) as just compensation for the taking of their barges, plaintiffs are also entitled to interest pursuant to law,[42] and costs,[43] with these amounts to be determined under Rule 131(c).

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the Court and made a part of the judgment herein, the Court concludes as a matter of law that plaintiff is entitled to recover, and judgment is entered to that effect, with the determination of the full amount of recovery to be reserved for further proceedings under Rule 131(c) in accordance with this opinion.

---

January or February 1966 from Basswood Lake to Fall Lake over the Portage; that even though the pontoon boat was less than one-fourth the size and weight of one of plaintiffs' barges, it was a very tough job to move it; and that to accomplish the move, he had to melt the ice around the boat, pull the boat up onto the iced lake, move it over to and onto the Huba-check landing, get it past the cabins located there, all those steps being accomplished with considerable difficulty and requiring great care, even with a crew of at least six men and various pieces of moving equipment.

39. *New York v. Sage*, 239 U.S. 57, 61, 36 S.Ct. 25, 26, 60 L.Ed. 143, 146 (1915); *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236, 1244 (1934); *United States v. Miller*, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943); *United States v. Reynolds*, 397 U.S. 14, 16, 90 S.Ct. 803, 805, 25 L.Ed.2d 12, 15 (1970).

40. Defendant contends that it should be compensated for plaintiffs' continued possession of the barges from January 19, 1966 to an uncertain date in 1969 by lessening the fair market value figure of each barge to reflect either rent for that period or additional depreciation of 10 percent. During this period, while plaintiffs remained in possession of their former real property and three barges, they continued to maintain that property in the same manner as during their ownership of it. The cost of the maintenance of the barges during this period was in the nature of rent. On this point, the Court is in the same position as the Eighth Circuit in the prior proceeding, for defendant has not offered any proof of fair rental to which plaintiff, of course, would be entitled to respond, *United States v. 967.905 Acres of Land*, 447 F.2d 764, 771–74 (1971). Thus, no additional allowance should properly be exacted of plaintiffs in the form of either a rental payment or additional depreciation.

41. Plaintiffs' petition is accordingly amended to conform the dollar amount requested to reflect proof adduced at trial in this amount on the Court's own motion pursuant to Rule 39(b).

42. *Daily v. United States*, 90 F.Supp. 699, 702–3, 116 Ct.Cl. 723, 733–34 (1950); *Drakes Bay Land Co. v. United States*, 459 F.2d 504, 512, 198 Ct.Cl. 506, 520–21 (1972).

43. When defendant contests liability in an inverse condemnation case, plaintiffs are entitled to costs. *Rocca v. United States*, 500 F.2d 492, 495–97, 205 Ct.Cl. 275, 281–84 (1974); *Drakes Bay Land Co. v. United States, supra* note 42.