**UNITED STATES of America,**
**Appellant,**

v.

**Frank S. BUHLER, et al., Appellees.**

**No. 18889.**

United States Court of Appeals
Fifth Circuit.

July 6, 1962.

Roger P. Marquis, A. Donald Mileur, Attys., Dept. of Justice, Washington, D. C., Ramsey Clark, Asst. Atty. Gen., Washington, D. C., Woodrow B. Seals, U. S. Atty., Arthur L. Moller, Asst. U. S. Atty., Houston, Tex., for appellant.

David T. Searls, Willard C. Williams, Houston, Tex., Conde N. Anderson, Victoria, Tex., William R. Eckhardt, Eastham, Williams & Meyer, Houston, Tex., for appellees (Rice Tenants).

Before TUTTLE, Chief Judge, HUTCHESON and JONES, Circuit Judges.

TUTTLE, Chief Judge.

This is the second appearance of this case here. It is an appeal by the Government from a condemnation award made by commissioners appointed by the trial court, and approved by the trial court. On the earlier appeal, 5 Cir., 254 F.2d 876, this Court held that the trial court did not commit error in refusing to assign the case to a jury rather than refer the matter to commissioners.

The condemnation proceedings dealt with six tracts of land, all of which had formerly been part of one larger contiguous tract or area owned by the Buhler family in the vicinity of Victoria, Texas, containing 4419 acres. The first taking was in September, 1952. Subsequent takings occurred in February, 1953, December, 1954, June, 1955 and July, 1955.

Much the largest taking was in the tract known throughout the litigation as Tract 1, consisting of 1144 acres. Also much the sharpest disputes as to the award deal with this tract. Damages awarded to the landowners for the value of land taken in this tract amounted to $1,027,700. Severance damages resulting from this taking to the remainder of the 4419½ acres were awarded in the sum of $64,900, making a total award as to Tract 1 of $1,092,600.

Damages for the taking of the remaining five tracts, including severance damages, amounted to $176,250, of which amount approximately $145,000 represented severance damages as contrasted with some $30,000 for the value of the land taken.

The circumstances surrounding the taking of the Buhler property were such as to make it peculiarly difficult for any tribunal to arrive at a fair value of the property taken. Some of these circumstances will now be detailed.

The condemnees here, the Buhler family, owned a tract of land of 4419 acres, generally in the form of a rectangle, on the north side of U. S. Highway 59, for a distance of 3¼ miles, with a depth between 1⅓ and 2⅔ miles. The property was situated easterly from the city of Victoria, Texas, in such manner that the closest point to the city limits of Victoria at the time of the first taking in September, 1952, was about three-quarters of a mile. The furthest point from the city limits on Highway 59, therefore, would be approximately 4 miles. By the time of the last taking the city limits had been extended approximately one-half mile to the east. Much the largest part of the tract was open, unimproved property, used for grazing or crop land. 2915 acres of it were subject to a lease for rice farming for a twelve-year term, of which approximately 10 years were still to run after the taking in 1952. In the Southeastern quarter of the property, the United States Government had built, during the second World War, an air base, including hangar and associated large buildings, and a triangular set of parallel runways, containing 750,000 square yards of concrete pavement. We refer to this as the "air field" area. Adjacent to this property, and a little bit to the west of it were the buildings that supported the air field activities, consisting principally of several large warehouse buildings and railroad track facilities and utility buildings. We refer to this as the "industrial" area. Further still to the west, is what was known as the "cantonment" area. Here there were the remnants of a former residential area for military personnel, in which there still existed certain paved streets, although the houses had been razed and

removed from the sites, except for foundations and similar masonry portions of the former buildings. This area also included a former officers' club building that had been remodeled by the Buhler family into a residence, in the vicinity of which was a usable swimming pool.

■■ Thus it is that the Government sought to condemn in the first taking in September, 1952, to establish a jet air base facility, a tract of 1144 acres, which included all of the three property areas just described. Some of the circumstances that make it difficult for an objective valuation of the property to be made are: first, although the hangar and airport facilities which were taken, were built at government expense, and were now to be re-taken by the Government for use as a jet airbase, it is nevertheless necessary for the Court and all concerned to bear in mind that regardless of the fact that the Buhler family acquired these facilities as surplus, and without the payment of any substantial sum for the airport as such, they are nonetheless entitled to be compensated for the real value of the property taken, even if that value has been greatly enhanced by the presence of these improvements on the land at the time of the taking. Second, however, it must equally be borne in mind, that the fact that the Government was taking the property so that it might have these very same facilities for use for an airport, does not of itself add any value to them, since the inquiry is as to the reasonable market value of the property taken, without regard to the particular use to which it is to be put. See Olson v. United States, 292 U.S. 246, especially at page 255, 54 S.Ct. 704, at page 708, 78 L.Ed. 1236 where the Supreme Court said:

> "That equivalent is the market value of the property at the time of the taking contemporaneously paid in money. Seaboard Air Line Ry. v. United States, 261 U.S. 299, 306 [, 43 S.Ct. 354, 67 L.Ed. 664]. Jacobs v. United States, 290 U.S. 13, 17 [, 54 S.Ct. 26, 78 L.Ed. 142]. 2 Lewis, Eminent Domain, 3d ed., §

682, p. 1172. It may be more or less than the owner's investment. He may have acquired the property for less than its worth or he may have paid a speculative and exorbitant price. Its value may have changed substantially while held by him. The return yielded may have been greater or less than interest, taxes and other carrying charges. The public may not by any means confiscate the benefits, or be required to bear the burden, of the owner's bargain. Vogelstein & Co. v. United States, 262 U.S. 337, 340 [, 43 S.Ct. 564, 67 L.Ed. 1012]. He is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more. It is the property and not the cost of it that is safeguarded by state and federal constitutions. Minnesota Rate Cases, 230 U.S. 352, 454 [, 33 S.Ct. 729, 57 L.Ed. 1511]."

■ There is the further complicating factor that two-thirds of the entire 4419 acre Buhler farm was subject to ten years of a rice lease which would have to be taken into consideration both in determining the highest and best use of the property as a whole for valuation purposes and in determining how much a hypothetical purchaser would pay for the tract as a whole before and after the takings. Both parties and the commission treated the entire 4419 acre tract as a single holding for valuation purposes.

The other takings were for the purpose of rounding out the jet air base and its facilities. In the main these takings offered different problems, but the property was, in general, unimproved except for a barn, in one instance, as to which there is no substantial dispute here, and except for a flowing well that had been drilled and was in use by the rice tenants and an irrigation canal, in another instance, as to which we will deal later in the opinion.

After the commission made its findings in the amounts already stated above, the

trial court affirmed the awards over the objection of the Government, which then appealed the judgment of the trial court. This appeal was dealt with by us in 254 F.2d 876. We there stated:

"The report of the commission filed February 13, 1956 is extremely general in nature."

The court then determined that the findings of fact by the commission were not adequate in form or substance to permit it to determine whether the Government's contention that the valuations were based on erroneous theories of the law or on insufficient evidence of value should prevail. We, therefore, vacated and remanded the award and the trial court remanded it to the commission for the purpose of permitting the commission to make more adequate findings to support its conclusions, either with or without the taking of additional testimony. No additional testimony was in fact taken, but the commission reaffirmed its award in all respects, after undertaking to make elaborate statements of the basis on which it made each finding.

The largest dollar amount as to which the Government contends the commission erred, results from the fact that the commission considered that the presence of a part of tract 1 of the hangar and the concrete air strips and air field drainage system contributed to the value of the whole tract taken the sum of $422,550. This figure, it must be borne in mind, is in addition to the value of the land on which these improvements were placed. The Government's attack on this increment of value is threefold: first, the Government says that the entire apprisal method was erroneously handled by the commission in that it received evidence as to the use and value of a small part of the whole (in this instance approximately 188 acres of land), and then, having developed evidence as to the maximum value of this area, if ideally used, the commission then combined this value with values similarly arrived at for other small tracts of land as to which similar computations had been made, and then

it heard a witness testify that each of these different uses would contribute the stated value to the entire tract in arriving at the fair market value of the entire tract; this, the Government says, was erroneous in that it caused the commission to give maximum value for each small area for a particular purpose or use, without realizing that the market value of the whole tract would depend upon the hypothesis that a willing and able purchaser would be found who would acquire the entire tract, with its good and its bad points affecting its worth to him; second, that the figures on which the commission based its valuation were really figures of reproduction costs less depreciation (although the figure approved or adopted by the commission, was not the full reproduction cost less depreciation, but as to many of the buildings 90% of such figure, as to the hangar, 60% of such figure, and as to the concrete work on the air strips and aprons, 15% of such costs less depreciation), without any showing having been made that a hypothetical purchaser of the property would be likely to reproduce the physical features of the premises if he were to acquire it by purchase; third, that these values were given to the property upon the assumption that there was a reasonable likelihood that a purchaser would use this particular part of the property in such manner as to make these improvements worth $422,550 on the occasion of such a sale, whereas the Government contended that no evidence in the record warranted any such assumption.

These contentions by the Government were made the basis of part of the discussion by this Court when the case was here formerly. At that time this Court commented:

"Parcel No. 1 comprised 1144.71 acres out of the aggregate of 1471 acres condemned. The $1,091,600.-00 award for that parcel represents almost 90% of the total award. The report contains no discussion specifically addressed to that parcel or to the various highest and best uses

—airfield, warehouse, subdivision, farming—claimed for it. The principal dispute between the parties was apparently the need vel non for the airfield and related improvements and their consequent value as such. The report failed to make any findings on that issue. The district court undertook to supply that deficiency by stating in its opinion confirming the commission's report:

" 'The testimony offered by the landowners complied with the principles announced in the above cases and established that the airfield, hangar and buildings on Tract No. 1 were suitable for aircraft manufacture and industrial purposes, and that because of their location and other available facilities, they would be needed in the reasonably near future for such purposes.'

"That bare conclusion, without more, is of little aid to this court in reviewing the determination of just compensation. The findings do not disclose the different highest and best uses for various portions of the property, the extent, if any, to which reproduction costs were considered in arriving at any part of the award, nor the economic units into which the property was divided in considering and determining its value. Before we come to a review of the ultimate question of just compensation, we feel the need of more adequate findings of fact and conclusions of law. See United States v. Cunningham, 4 Cir., 1957, 246 F.2d 330." United States v. Buhler et al., 5 Cir., 254 F.2d 876, 882, 883.

 We have very carefully read the record in this case, a record comprising over 2300 pages. We find that upon remand the commission did make further findings to support its conclusion that the fair market value of the property should include an increment of $422,550, for these airfield improvements.[1]

---

1. These findings are as follows:

"The air field pavement and air field drainage as valued in the Cummins' Report totals $2,117,000.00. The Commission finds that while this is a true and correct amount of the reproduction cost new, less depreciation, of these three items, it cannot be accepted as a measure of the amount by which they enhanced the value of the ownership. The Commission finds, after taking into account all of the pertinent evidence relating to the usefulness of these items and the economic factors affecting the demand therefor, that their reproduction cost new, less depreciation, should be discounted 85%, or, to state the matter conversely, that they contributed to the cash market value of the ownership only 15% of their reproduction cost new, less depreciation, which is the sum of $317,550.00.

"The witness Hart testified that if there were a use for these facilities for air field purposes, only 15% of the facilities would be necessary for such an operation.

"The Commission finds that a purchaser bargaining for the property would expect to have the use and control of the entire air field facilities. It further finds that there was a demand and a prospect for use of such facilities in the reasonably near future which would justify the al-

lowance of at least 15% of the reproduction cost new, less physical depreciation, of these facilities in determining the market value of the whole ownership. In this connection, the Commission has considered that a use of the runways restricted to 15% of the area would release for use the remainder of the concrete surfaced land with its excellent drainage system, which would justify the valuation of these improvements as determined by the Commission.

"The value of the air field drainage alone was shown in the Cummins' Report as $295,000.00. This represented a permanent improvement to this portion of the ownership, which, together with the concrete surface area that it served, made the area suitable for the construction of commercial and industrial buildings, open air storage and similar uses for which the demand would be expected in the reasonably near future. To the extent that the Commission has given value to these improvements, therefore, they would contribute to the cash market value of the ownership either if used for air field purposes or partly for air field purposes and commercial and industrial purposes, or wholly for commercial and industrial purposes, without being used as an air field."

The commission further stated, in what it called its "Final Summarization":

"Although the question of the value of the air field was the subject of the testimony or practically all of the witnesses, there were three whose testimony with respect to pertinent use and demand of the property was more important because it came from those, who, by virtue of their experience and knowledge of the subject matter, were in a position to testify with more authority on these points. These were the witness Brougher, the witness W. T. Brown and the witness Fuller. It is clear from the testimony of these witnesses and the Commission finds that there was no demand for the full use of the air field facilities as such at the time they were taken. On the other hand, it is clear from the testimony of these same witnesses that these facilities were useful for, and that there was a demand for them at the time of taking for various uses comprising both aviation and non-aviation purposes, including the manufacture, repair and conversion of aircraft and a limited use for storage, flight training and private transportation, including cropdusting, and for any number of non-aviation purposes which might be used in combination with the aviation purposes above mentioned."

In United States v. Benning Housing Corporation, 5 Cir., 276 F.2d 248, which was decided after the commissioners had made their first award in this case, this Court found fault with the use of reproduction costs, less depreciation, as evidence of value in a condemnation suit, except in the unusual situation, and we pointed out there that even where it was appropriate to use such proof of value "there must be a showing that substantial reproduction would be a reasonable business venture." 276 F.2d 248, 250.

First, the method of proof of the underlying possible uses of each of the three areas by separate experts, each purporting to have special knowledge on different potential uses, was well calculated to emphasize the separate value that might be realized from a use by a purchaser who was interested in each particular type of property and to cause the commission to add their separate values together rather than to keep firmly in mind that the 1144 acre tract must be valued as a whole. Undoubtedly there would be quite a different market potential for a tract of such varied component parts, each having an attraction for its own characteristics and for the total tract of 1144 acres, much of which was "over improved" in the unanimous opinions of the experts. In fact it is difficult to glean from the testimony in the record any single opinion by the valuation experts that a hypothetical purchaser able and willing to buy would have paid to an equally able and willing seller, neither of whom was under compulsion to deal, the figure that was actually achieved by an addition of the separate values assigned to the several tracts. We think this emphasis on separate valuations is not the best way to deal with condemnation valuations. However, we think the case can better be disposed of by us without holding that the award was vulnerable on this particular ground.

Turning to the second basis of the Government's complaint as to the value attributed to the total area by the existence of the concrete runways and airfield drainage, it is plain that there is neither any finding by the commission, nor is there any evidence upon which such a finding could be made, to the effect that there was any such demand at the time of the taking of tract 1 for airfield facilities, such as here constituted a part of the tract, as would justify reproduction by a purchaser of runways and drainage facilities at a total cost of $317,550, or for a hangar building like Building T-638, at a cost of $105,000.

The landowners' witness Brougher, whose testimony is referred to by the commission as being the basis for its determination of values, evidenced no knowledge of any existing or probable de-

mand in the near future such as would permit a finding that any potential purchaser for the entire tract of land, would consider reproducing these airfield facilities. His testimony as to the large and important growth of the area in which Victoria is situated, the many industrial improvements and developments in the area producing large increases in the population, the increase in the aircraft industry itself, did not permit a soundly based opinion that it was likely or even probable that any hypothetical purchaser would reproduce the elaborate set of runways even if they could be reproduced at 15% of the cost less depreciation.[2]

Brougher testified to no facts touching on any actual demand for the purchase of airfields as such. Other landowner witnesses testified that airfields were not at the time being bought and sold. It was undisputed that there were numerous airfields available in private control.

The reference in the commission's report to witnesses Brown and Fuller is clearly misplaced. It is impossible to read their testimony without concluding that they both were of the opinion, which they stated positively, that there was no demand for facilities of the kind here present in the sense that any aviation company or company needing planes in its operation would acquire a tract of land like that which is here up for valuation, and include in the price paid for it any substantial amount because of the existence of this 188 acres of concrete strips. These were the two witnesses who, by reason of their training and experience, were fully qualified to give opinion evidence on this point.

Our analysis of the record forces us to the conclusion that while there was ample evidence from all the qualified witnesses

that the hangar, as well as the warehouses in the industrial area contributed substantially to the value of the entire tract of land taken, no separate increment of value of the hangar, as a part of an airfield facility could properly be found by the commission. The value of the so-called airfield area, therefore, so far as it contributed to the market value of the entire tract, must be reduced by the allowances made by the commission for the percentage of cost, less depreciation, of the airfield paving and the airfield drainage, and by the amount of the percentage of cost, less depreciation, of the hangar building, to the extent that the $105,000 found as a value of the hangar building exceeds its value for other industrial uses, such as a warehouse. There is ample evidence in the record as to its value as to warehouse space.

■■ Our conclusion that the value of a part of the reproduction cost of the improvements on the airfield area can not stand is based on two grounds. The first is that the most the commission could find as to the airport facilities is that the potential buyer of the entire tract would consider the value of the improvements consisting largely of a substantial group of buildings in which various manufacturing or industrial processes could be carried on, and warehousing could be done either independently or in conjunction with such industrial enterprises; that the presence of these improvements would be reflected in the land values of that part of the tract that was best adaptable to industrial uses. But in the absence of any evidence of demand for airport or airfield facilities as such, it would be pure speculation for the commission to determine that the highest and best use for this property, within

---

2. All of the witnesses who testified on the point, testified that even for aircraft use the existing runways were "an over-improvement." In point of fact, while there were three sets of parallel runways on the field, it was shown that the Government for the jet base operation was using only a 75-foot runway consisting of one leg of

the triangle; thus casting considerable doubt as to whether the remaining 225 feet in width of the 300-foot runways and the remaining 75 feet in width of the 150-foot runways, which were present on this field, would be useful or needed even if there was a demand for the property as an airfield itself.

legal contemplation, would be for use as an airfield. In this connection, this Court has said in Cameron Development Co. v. United States, 5 Cir., 145 F.2d 209:

"Just compensation, within the meaning of the Fifth Amendment to the Constitution, is the fair market value of the property at the time of taking contemporaneously paid in money. In determining this value, the highest and most profitable use for which the property is adaptable and needed, or is likely to be needed in the near future, is to be considered; but elements affecting value that depend upon events, which while possible are not fairly shown to be reasonably probable, should be excluded. The judicial ascertainment of fair market value may not rest upon speculation and conjecture."

The second basis is that the reproduction cost, less physical depreciation, has no relevance whatever in valuing these improvements. There is no indication from any of the testimony given by any of the witnesses that there was such a demand for these particular facilities, or facilities of their type, in the vicinity of Victoria, or anywhere else in the state of Texas, that would warrant a finding that "substantial reproduction would be a reasonable business venture". (United States v. Benning Housing Corp., supra). That being the case, the only question remained: what was the 1144 acres of land worth with the improvements that were there present, giving consideration to the peculiar value of any of the improvements in the same manner as a prospective purchaser would view them at the time of taking? Just as it would make no difference to a prospective purchaser what it would cost to reproduce these buildings, unless there was a showing that there was such demand for them as they stood as to amount to a reasonable likelihood that they would be placed on the property if they didn't then exist, so the commission should not have considered the evidence of reproduction cost, less physical depreciation, under the circumstances here present.

We turn next to the industrial area. We find that there was ample evidence in the record for a finding by the commission that there was some demand, at the time of taking, for all of the warehouse buildings, as well as for the hangar heretofore discussed. Once more, the commission fell into error by receiving and considering evidence as to the reproduction costs, less physical depreciation, of all of these buildings. As to the hangar building, it allocated a value of $105,000, which represented an arbitrary 60% of the reproduction cost, less depreciation, figure. As to the other warehouse buildings, with a single exception, it allocated a figure representing 90% of the reproduction cost, less depreciation. Under the circumstances here present, since there was no evidence that any prospective purchaser would be likely to reproduce these buildings, since there was no established basis for a finding that they were particularly or ideally suited for any especial type of operation, but merely that they offered opportunities for attracting industries having need for factory and warehouse space, their valuation should have been based either on proof of what they were worth removed from the property, or proof of what they were worth on the basis of their value as a source of income in place. The commission erred in excluding testimony tendered by the Government as to the value of the buildings if removed from the property. However, this evidence was tendered to complete the record, and it is now before the trial Court, and can be considered by it.

We next turn to the Government's criticism of the commission's findings relative to the added value to the entire tract resulting from the improvements present on the land in the Cantonment area. While this finding is also subject to the criticism that there was no showing whatever that a potential purchaser of the entire tract would be likely to put down these street improvements, there was nevertheless qualified real estate opinion evidence as to the value of this particular tract as a potential sub-

division area when taken in connection with the development of the remainder of the tract for industrial purposes, so that we are loathe to conclude as a matter of law that the judgment based on the commission's findings as to the value to be attributed to this increment of improvement is clearly erroneous.

The next largest item, dollar-wise, of which the United States complains, is the item considered by the commission as "severance damages," into which classification the commission included damages to the remaining part of the entire tract of 4419 acres, expected to result from the use to which the land taken would be put as a jet air force base. This damage the commission found, resulted to the adjacent parts of the remaining tract from "its proximity to the noise, vibration and hazard of the operation of a jet air force base on tract 1," and as to a small part of the remaining tract (502 acres northeast of tract 1) "by reason of the exposure of the land north of the tract taken to the hazards, real or psychological, attendant upon" the use of the land taken "for the purpose of constructing an ammunition area and a firing-in butt." The amount allocated by the commission as severance damages attributed to the "proximity to the noise, vibration and hazard of the operation of a jet air force base" totalled $36,446. The amount which it attributed to the "exposure of the land * * * to the hazards, real or psychological, attendant upon" the use of the land for "constructing an ammunition area and a firing-in butt" was $30,100.

All of these severance damages were based upon the assumption by the commission that the highest and best use for the lands to which they were attached was residential use. This, notwithstanding the fact that every acre of this land was at the time of the taking, and would be for 10 years thereafter, subject to a rice lease. In determining the highest and best use of the entire tract before the taking—that is the 4419 acres—the commission considered evidence of numerous sales of land in and about the city

of Victoria. The nineteen sales particularly referred to by the commission in its finding for the period prior to September 22, 1952, varied in size from one acre to fifty-six acres. Most of them were for less than ten acres. While these sales could, of course, give a basis for a qualified real estate person to give an opinion as to the value of land taken in 1952, if its highest and best use was for residential purposes comparable to those referred to, they could not either individually or all of them collectively be the basis of an opinion that the approximately six square miles of the Buhler property other than that identified for industrial purposes along Highway 59, and in the vicinity of the so-called industrial area, had a highest and best use for residential purposes, especially at a time when all but approximately 400 acres of it had been leased out for the next ten years for rice farming.

Ordinarily, the highest and best use for property sought to be condemned is the use to which it is subjected at the time of the taking. This is true because economic demands normally result in an owner's putting his land to the most advantageous use. However, the courts recognize that there may be circumstances that result in a finding that another use for the land may be the highest and best use. The true rule is generally stated to be "the highest and most profitable use for which the property is adaptable and needed, or likely to be needed in the reasonable near future." Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236; Cameron Development Co. v. United States, 5 Cir., 145 F.2d 209, 210.

Here there is no evidence in the record that there was any reasonable likelihood that in such "near future," as is comprehended within the meaning of that term as used in the decided cases, any substantial part of this entire acreage would be *either* adaptable *or* needed for residential purposes. It is true that the existence of the rice lease on all of the lands found to be damaged by the severance of the condemned tracts does

not, in and of itself, require a finding as a matter of law that the agricultural use is the highest and best use for the land. However, it must be borne in mind that the hypothetical purchaser viewing the entire tract of 4419 acres with the purpose of buying it on September 22, 1952, must be presumed to have considered the fact that unless he bought up the interest of the rice tenants, 2915 acres of the land would be beyond his control for a period of ten years. Moreover, the fact that the owners of the fee had, in 1950, subjected the property to a lease for twelve years for rice culture is compelling evidence that they considered this the highest and best use for the property at that time.

As we have already said, it is competent for the owners of property to prove, if they can, that the actual use to which they are putting it is not the highest and best use for the property as viewed by a potential purchaser. Here there has been no such proof. There is nothing more than speculation that if a purchaser could be interested in buying the land even though he could not obtain possession of it for ten years he might work out a schedule of developing the premises for residential purposes satisfactory to himself and the rice lessees. The record before us warrants no conclusion other than that the only value which inhered in the owners in the 2944 acres under the rice lease, was their right to receive the rent during the balance of the term and the value of the reversion after the lease expired. On this record it must be decided as a matter of law that the highest and best use for all of the lands as to which the commission found severance damages from the noise or hazard of the operation of the jet air force base was for agricultural purposes.

The government also urges on us the proposition that such injury or damage as might accrue to the landowners resulting from the operation of the tracts taken by condemnation would not be subject to measurement and valuation in advance of the operation of the air base; that they are not properly severance damages and if they are, their nature is too speculative to be susceptible of proof in advance of the actual operation of the base. For instance, as an illustration of the speculative nature of these damages, the government points to the fact that the landowners asked the court to take judicial notice of the fact that Foster Field is no longer operated as a jet air force base, but is now operated as the airport for the city of Victoria, and that the anticipated dangers from jet aircraft operations no longer exist, and that at a time while the rice tenants are still in possession of the lands for agricultural purposes, whatever noise or hazard inhered in the jet air base operation no longer exists. The government contends that the Fourth Circuit Court of Appeals' decision in West Virginia Pulp & Paper Co. v. United States, 4 Cir., 200 F.2d 100, holding that severance damages could be awarded because the government proposed to use the property taken for storage of highly volatile gasoline is erroneous. The government prefers to rely upon the language of the Court of Appeals for the Third Circuit in Miller v. United States, 137 F.2d 592, where that Court said:

> "Plaintiff's claim of a 'mental hazard' which would serve to lower the value of his property would therefore appear to be based upon a fanciful and imaginative fear of too speculative and conjectural a nature to be submitted to the jury. See Rose Island Co. v. United States, D.C. 1930, 46 F.2d 802; Searle v. Lackawanna and Bloomsberg Railroad Co., 1859, 33 Pa. 57; Illinois Power & Light Corp. v. Talbott, 1926, 321 Ill. 538, 152 N.E. 486."

While we think there is considerable merit in the government's contention that the condemnation commissioners may not assess damages that are based upon assumed dangers, either real or fanciful, that may arise from the nature of the later operation by the condemnor, we do not need to reach this issue because we are convinced that there is no adequate

showing of damages of the nature ascertained by the commissioners because of our determination that the highest and best use of the land subject to these hazards is agricultural and not residential.

What we have just said relates particularly to the tracts of land subject to damage because of their proximity to the jet air base as such. As to the 502 acres in the northeastern corner of the tract, as to which the commission found an additional $60 an acre damage because of its proximity to an ammunition area, and the location of what one witness called a "firing-in butt," the same principle applies since there is no evidence in the record that the proximity to such an area would in any way detract from the values of agricultural lands. Moreover, as to this particular $60 an acre allowance, not a single witness testified as to the dangers to be apprehended from this use. The commission's finding of the $60 an acre damage to the 502 acres in question was based entirely on speculation and was without evidence to support it.

Our discussion touching on the highest and best use for the land remaining after the takings was not directed to the amount of the awards arrived at by the commission for the subsequent takings of the smaller tracts of land. In each instance the commission allowed $200 an acre as the basis for its awards. The discussion was directed to the inquiry whether the findings as to severance damages due to the proximity to the jet air force base were soundly based. While we consider that the allowance of $200 per acre for all of the lands taken except as to those which the commission found to be valued at a higher figure for industrial or residential (cantonment area) use was a maximum permissible award, we do not find that such valuation is without sufficient evidence to support it particularly in the testimony on behalf of the rice tenants. We, therefore, do not disturb the findings of the commission to the effect that all of the lands which were not valued at a figure higher than $200 an acre in the original entire

tract had a fair market value as of the time of the first taking of $200 per acre. The adjustments which result from our disallowance of the items of severance damages noted above, can be readily made by the trial court. This, of course, includes the making of an allowance for some of the lands taken in subsequent takings based on a $200 valuation, which had previously been discounted by the commission because some of these lands had already been reduced in value by reason of the findings of the commission that they had been damaged by the amount allowed as severance damages.

What we have heretofore said does not deal with the severance damages, properly so called, resulting from the interference of access to remaining parts of the land by the actual takings by the United States. These takings of this nature interfered with a flowing well of the rice tenants and a canal for irrigation purposes useful in the operation of the rice culture. We conclude that the circumstances here presented to the commissioners for solution were of such a unique nature that we can not find, as a matter of law, that they did not give the proper treatment to the valuation of the interest of the rice tenants. The government's principal contention in this regard is that the commission erred in having determined that the entire tract had a highest and best use for residential purposes, but then it gave full value to the use of the 2944 acres for continued use in rice culture. Since we have found that the highest and best use of this remaining part of the tract was for agricultural purposes, this contention of the government, of course, is not tenable. In short, the government has not demonstrated, as a matter of law, that the awards to the rice tenants and to the landowners for damages suffered by them by reason of the taking of these smaller tracts of land, in view of our holding that the highest and best use of the tract as a whole was for agriculture, was clearly erroneous. The rice tenants had an estate in the property, which was partially taken and partially damaged. For

this taking they are entitled to fair compensation. The landowners had a reversionary interest in the property covered by the rice leases. For the taking of this interest and for damages done to the part not taken, they are entitled to fair compensation. Although, it does appear that in making its awards the commissioners gave the landowners full value for the land taken just as if there had been no lease on the property, and then awarded the rice tenants the full value of their leasehold estates, this matter has not been clearly presented here and we merely hold that it may be re-considered by the trial court upon remand in light of our present holding that the highest and best use for this property was for agricultural purposes.

As pointed out in the opinion of this Court when the case was here last, we were then, as we are now, loathe to cause a further delay in the final disposition of this matter by taking such action as requires a full, new hearing before the commissioners or on a remand now requiring that the matter be submitted to a jury. Having pointed out certain areas in which we feel that the decision of the trial court must be reversed as being clearly erroneous, we think the matter now stands in such a posture as will permit the trial court to reconsider its findings based on the commission's report and give effect to our rulings announced in this opinion. As this Court said in United States v. Twin City Power Co. of Georgia, 253 F.2d 197, 204.

"It would be futile for the court simply to direct the commission to reconsider its findings."

In that case we quoted an opinion in United States v. Bobinsky, 2 Cir., 244 F.2d 299, 302:

"Of course it was not necessary for the district judge to send the case to a commission once again, and he was completely justified in concluding the protracted litigation with findings of his own. United States v. 44.00 Acres of Land, supra, 2 Cir., 234 F.2d 410, certiorari denied

Odenbach v. United States, 352 U.S. 916, 77 S.Ct. 215, 1 L.Ed.2d 123."

We have concluded that no value other than that assigned to the land itself can be attributed in the final award to the presence of the concrete runways in the air field area, that the value attributed to the hangar must be recomputed, as must be the value as to the warehouse buildings in the industrial area on the basis of their potential value to a purchaser of the whole tract rather than on a basis of a fixed percentage of their reproduction cost, less depreciation. There is ample evidence in the record already tabulated by the commission upon which the trial court can make these findings. We have also determined that the value to be assigned to the remaining area of the entire tract is for agricultural uses; that, therefore, no severance damage representing inconvenience or noise by reason of proximity to a jet air field is allowable. Finally, we have determined the trial court should review the record as to the damages allowed for the taking of the tracts that were subject to the rice lease in order to determine whether the total amount given to the landowners and rice tenants combined exceeded a figure that would represent a fair market value of the takings at the time the tracts were condemned.

A study of the record in this case, and the history it has pursued through the courts, again causes us to comment on the great desirability, wherever it is possible, for a trial court to give the most careful scrutiny before determining that a condemnation case should be referred to commissioners rather than to be submitted to a jury. It is true that since there were several successive takings in this case running over several years, it would have been quite difficult for a jury to have fully comprehended the essentials of the case in the ordinary course of a trial. On the other hand, we repeat here what this Court said in United States v. Leavell & Ponder, Inc., 5 Cir., 286 F.2d 398, 409:

"A jury trial at which the trial judge promptly rules on the admissi-

bility of proffered testimony and then narrows the issue by appropriate charge to the jury may, indeed, frequently simplify even what appears to be a complex valuation problem."

The judgment is reversed and the case remanded to the trial court for further proceedings not inconsistent with this opinion.