Samuel W. FORDYCE, IV, C.P. Fordyce, Ruth Fordyce, E.W. Fordyce, Downs Lander Fordyce, Lillian Fordyce Blackwell, John R. Fordyce, III, Roswell L. Fordyce and Mary Fordyce Allsopp

v.

The UNITED STATES.

No. 558–79L.

United States Claims Court.

March 12, 1985.

Edward Greensfelder, Jr., Washington, D.C., for plaintiffs; Gerald P. Greiman,

Marc D. Joseph and Greensfelder & Greiman, P.C., Washington, D.C., of counsel.

David R. Collins, Land & Natural Resource Div., Dept. of Justice, Washington, D.C., for defendant; Susan J. Rubin, Dept. of Justice, and Lars Hanslin, Dept. of Interior, Washington, D.C., of counsel.

## OPINION

MEROW, Judge.

This case arises out of a dispute involving the proper compensation due Samuel W. Fordyce, et al., plaintiffs, for their possessory interest in the building and improvements known as Fordyce Bathhouse. The bathhouse is located in Hot Springs National Park, Hot Springs, Arkansas. Plaintiffs are entitled to the "sound value" of the bathhouse as defined by the Concession Policies Act of 1965, 16 U.S.C. § 20e. *Fordyce v. United States*, 228 Ct.Cl. 1, 650 F.2d 1191 (1981).

The parties dispute the interpretation and the application of the statute. Plaintiffs maintain they are entitled to reconstruction cost less depreciation, as evidenced by the structure's condition and prospective serviceability in comparison with a new unit of like kind. Defendant, the United States, argues recovery is limited by the fair market value of the bathhouse.

A trial has been held and briefs have been filed. On the basis of the findings of fact and conclusions of law set forth below, it is determined that plaintiffs are entitled to $152,000, the fair market value of the bathhouse.

### Facts

The bathhouse was built by plaintiffs' ancestor, Samuel W. Fordyce, in 1914 and was opened on March 1, 1915. The plaintiffs operated a bathhouse business under contract with the National Park Service until 1962. In 1962 the Fordyce family closed the bathhouse because business had become unprofitable. This was due largely to the decline in popularity of bathhouses. Between 1962 and 1976 plaintiffs explored alternative uses for the bathhouse. They considered selling the business to a private water company, which wanted to use the building for office space and as an exhibit hall. Plaintiffs also considered using the bathhouse as a health spa. The National Park Service would not allow either use. The building stood vacant until November 1976. On November 1, 1976 the United States acquired plaintiffs' possessory interest pursuant to the Concession Policies Act of 1965, 16 U.S.C. § 20e.

The bathhouse is located in downtown Hot Springs on "bathhouse row." There is no on-site or nearby parking available. "Bathhouse row" was placed on the National Register of Historic Places, 16 U.S.C. § 470a, in the fall of 1974. It consists of eight bathhouses, including the Fordyce bathhouse, a visitor's district, 47 thermal springs, and a promenade along the rear of the bathhouses.

The Fordyce bathhouse is built in the Italian-Spanish Revival style. It contains three floors and a partially unexcavated basement. The building frame consists of load bearing brick masonry exterior walls approximately two feet thick and interior reinforced concrete columns, beams and floor slabs. The exterior masonry walls are faced with glazed brick laid in a diamond-shaped tapestry pattern on the second and third floors, above eight courses of 18-inch by 18-inch soft ivory glazed terracotta block and terra-cotta cove cap and belt course that covers the first floor walls. The terra-cotta is above three course of limestone and one limestone cove cap course. Between the tapestry face brick and roof cornice on the west (front) side of the building is a glazed terra-cotta frieze, approximately four feet tall, which is elaborately designed and highlighted by a double vase pattern between each window. The second and third floor windows, and first floor windows at both ends of the porch, are surrounded with elaborate terra-cotta borders that include carved heads, Cupid heads, vases, flowers, shields, colonettes and balconies with railings.

The front porch is covered by a canopy constructed with copper and a cast bronze facade and escutcheons. The words "FORDYCE BATH HOUSE" are displayed in the stained glass overhang from the canopy. The canopy is supported by 10 bronze chains attached to 10 cast bronze anchor faces located in the building wall.

The gymnasium roof and the roof over the front of the building are covered with clay tile. A tile-covered Italianate roof projection overhangs the front and two sides of the building. The roof is flashed with copper and has copper gutters and downspouts with copper ornaments spaced along the gutters.

The main lobby has a 3/4-inch square vitreous tile floor in a mosaic pattern with a 12-inch mosaic border. The wainscoting is 9-foot 6-inch high polished marble. An ornamental molded plaster cornice surrounds the room. At both ends of the lobby are glazed terra-cotta fountains. Over the polished plate glass front windows are stained glass windows.

The principal first floor room is the main bath hall. It contains many of the 29 oversized vitreous china tubs, each in its own stall. The stall partitions are polished marble, as are two 14-foot long marble benches. The floor is vitreous tile. The highlights of the room are the 14 by 17½ -foot stained glass skylight, surrounded by a molded plaster cornice, which is above a DeSoto fountain, a terra-cotta sculpture of an Indian Maiden offering a drink to Hernando DeSoto. The first floor also contains cooling and pack rooms, each with tile floors, marble partitions, ceramic tile wainscoting, vitreous china tubs, sitz baths, sinks and drinking fountains.

On the second floor there are dressing rooms and cooling rooms with tile floors, wainscoting, and heart red tidewater wood casement windows.

On the third floor there is a museum. The museum ceiling consists of an arched stained glass skylight surrounded by a molded plaster cornice. The floor is finished with one-inch square tile with a mosaic pattern and a 28-inch mosaic border. At each end of the museum is a room with mosaic tile floors and wood burning fireplaces with walnut mantles. Also on the third floor is the "Hubbard Tub," a large tile-finished tub with an overhead trolley and monorail system used to lower handicapped customers into the tub. Finally, there is a gymnasium on the third floor. It has a wood floor and wainscot, and a high steel truss framed ceiling.

Transportation between floors is either by an elevator which has circle-headed doorways or by stairs which have marble treads, risers and wrought iron railings with black walnut rails.

The significance of the Fordyce bathhouse was described by the National Park Service when the bathhouse was placed on the National Register of Historic Places as follows:

As few of the great spas of the 19th century in America are still in existence, the Bath House Row in Hot Springs takes on additional significance. This building [Fordyce Bathhouse] is the finest of the group, and is an outstanding example of the Spanish-Italian Revival. The entire group, with their beautiful planting, and the fine Italian Revival fountain which adjoins this building, is the finest row of bath houses left in America. With the new master plan, of which this survey is a part, this building could easily be restored, and with added functions, become an important part of the new master plan. As the American public tires of the infinite standardized motel, such variations as Bath House Row take a new significance and importance, as a valuable part of our heritage. It is also one which the American public is taking a renewed interest in, as it travels more and can afford longer vacations.

Prior to its closure in 1962, the bathhouse was in a relatively good state of repair. The building was dry and the paint and plaster were generally well maintained. There was some deterioration of the building between 1962 and 1976. The parties

dispute the extent of the deterioration. Plaintiffs maintain the building was structurally sound in 1976. Defendant presented evidence to indicate structural damage as well as evidence indicating general deterioration. For example, defendant established that there were cracks in the stained glass and in the wire reinforced glass, as well as deterioration of window frames, loose roofing, a leaking roof, a leaking marquee and animal infestation.

At trial, plaintiffs presented two expert valuation witnesses. Plaintiffs' experts testified that the bathhouse was a special-purpose property and therefore had no fair market value. Both expressed the opinion that the highest and best use, or the most economical use, of the bathhouse was a museum. Neither performed independent studies or analysis to determine whether there was a market for such a museum. They relied primarily on the stated intention of the National Park Service to use the bathhouse as a museum. Plaintiffs' experts also relied on feasibility studies made by or for the National Park Service.

Since plaintiffs' experts determined the structure is a special-use property whose highest and best use is a museum, they used the reconstruction[1] less depreciation method to value the building. Plaintiffs' experts determined the value of the bathhouse at $980,000, calculated as follows:

| | |
|---|---:|
| Reproduction cost using the same or similar materials as originally used | $3,610,000 |
| Less: | |
| Physical depreciation curable | 1,500,000 |
| Physical depreciation incurable | 1,055,000 |
| Functional obsolescence curable | 75,000 |
| Functional obsolescence incurable | –0– |
| Economic obsolescence | –0– |
| | $ 980,000 |

**1.** It is clear from the legislative history that the reconstruction cost and reproduction cost were considered equivalent.

"The terms 'reconstruction cost' and 'reproduction cost' are synonymous, and that the terms have the meaning given on page 188 of 'The Appraisal of Real Estate,' prepared by the American Institute of Real Estate Appraisers; namely, 'Reproduction cost is the present cost of replacing (the improvement) with as nearly an exact replica as modern materials and equipment will permit.'"

Defendant presented two expert valuation witnesses. Defendant's experts testified the highest and best use of the bathhouse was an owner-occupied office building, with the possibility of a specialty shop or boutique on the first floor. This appraisal was made without consideration of National Park Service contract restrictions. However, zoning restrictions and the fact that the building was on the National Register of Historic Places were considered. In determining that an owner-occupied office building would be the most economic use of the bathhouse, defendant's experts considered the following factors: the historical character of the building, the structural soundness of the building, the location of the building, the lack of parking near the bathhouse, the functional obsolescence of the building, and the deterioration of the building.

Using the comparable sales appraisal method, defendant's first expert, James Sawyers, calculated the value of the bathhouse as $152,000. Mr. Sawyers compared the property on a unit basis with similar recently sold properties in cities the approximate size of Hot Springs. The bathhouse was compared with 11 other buildings, most of which were originally post offices or other federal buildings. The similarities between the compared properties and the bathhouse include the following: all are located near the center of communities; all have limited or no on-site parking; all are "monumental" structures designed and constructed to stand for many years; all are obsolete in that they no longer serve the purpose for which they were designed; all have a high degree of obsolescence

S.Rep. No. 765, 89th Cong., 1st Sess. 4, *reprinted in* 1965 U.S.Code Cong. & Ad.News 3489, 3492. Each party disputes the other party's figures used in calculating the reproduction cost less depreciation. Since it is concluded that any recovery of reconstruction cost less depreciation in this matter would exceed the fair market value of the property, no findings are made concerning the validity or invalidity of the several specific figures used by the parties in calculating these costs.

when they are considered for an alternative use; all have a poor ratio of usable area to gross area; all contain outdated heating and lack air conditioning. Adjustments were made for dissimilar factors. The dissimilarities between the subject property and the comparable buildings are: the bathhouse is located above a hot spring which creates a humidity problem; and the bathhouse is of an unique construction which creates a character not present in the comparable properties.

Defendant's second expert witness, Leland Bookhout, also calculated the value of the bathhouse under the market data approach. Mr. Bookhout based his appraisal on the sales of other bathhouses on bathhouse row and of property with historic significance in the local Hot Springs area. These properties included a train station which was converted into a restaurant and two banks, one of which was placed on the Historic Register shortly after it was purchased and one which was demolished shortly after it was purchased. Mr. Bookhout determined the market value of the Fordyce bathhouse to be between $62,000 and $74,000.

Both Mr. Sawyers and Mr. Bookhout appraised the property under the cost approach. This estimates the cost of reproducing the building. Using this approach, Mr. Bookhout appraised the value of the bathhouse at $49,000. His calculations are as follows:

| | |
|---|---|
| Reproduction cost new | $2,284.060 |
| Mr. Bookhout estimated this cost based on discussions with an architect, a building engineer and on review of Boeckh's and Marshall's cost manuals. | |
| Less depreciation | |
| Physical depreciation curable | 1,179,482 |
| Physical depreciation incurable | 662,747 |
| Functional obsolescence curable | 64,124 |
| Functional obsolesence incurable | 235,166 |
| Economic obsolesence | 83,384 |
| | $ 49,157 |

2. The parties agree the time of the taking was November 1, 1976, the date plaintiffs surren-

Mr. Sawyers appraised the value of the bathhouse at $155,000. This figure was calculated as follows:

| | |
|---|---|
| Reproduction cost | $2,451,724 |
| The reproduction cost was estimated twice. First, Mr. Sawyers calculated the historic cost and used a multiplier from the Marshall Valuation Service to determine the cost in 1976 dollars. Second, the square foot cost method was used. Under this approach, Mr. Sawyers selected the building closest in description and quality as the base cost. The base cost was then modified for time, location, size and other dissimilarities to arrive at an estimated cost. | |
| Accrued depreciation | |
| Deterioration curable | 350,321 |
| Deterioration incurable | 1,576,052 |
| Functional obsolescence curable | 80,559 |
| Functional obsolescence incurable | 120,540 |
| Economic obsolesence | 169,270 |
| Total accrued depreciation | $2,296,742 |
| Depreciation reproduction cost new | $ 154,982 |

### Discussion

16 U.S.C. § 20e provides (in part):

Unless otherwise provided by agreement of the parties, just compensation shall be an amount equal to the sound value of such structure, fixture, or improvement at the time of taking by the United States determined upon the basis of reconstruction cost less depreciation evidenced by its condition and prospective serviceability in comparison with a new unit of like kind, but not to exceed fair market value. * * *.

The parties dispute the meaning of the standard.[2] Plaintiffs maintain that the statute provides for the sound value of the bathhouse as measured by the reconstruction cost less depreciation evidenced by its condition and prospective serviceability in comparison with a new unit of like kind. Plaintiffs essentially discount the last phrase of the statute, "but not to exceed fair market value," and argue that recovery is not limited by fair market value. Defendant maintains the statute limits compensation to the structure's fair market

dered their interest in the bathhouse to the National Park Service.

value when, as in this case, the fair market value can be determined.

■ In ascertaining the meaning of a statute, the first inquiry must be directed to the statute's language. If the language is plain, the duty of interpretation does not arise and the court is limited to enforcing the statute according to its own terms. *Texas State Commission for the Blind v. United States*, 6 Cl.Ct. 730, 738 (1984) (citations omitted). A plain reading of 16 U.S.C. § 20e indicates that the proper recovery is reconstruction cost less depreciation evidenced by its condition and prospective serviceability in comparison with a new unit of like kind only when this value does not exceed the fair market value of the structure. This interpretation is necessary because the last phrase of the statute, "but not to exceed fair market value," set off by a comma, acts to limit the preceding phrase setting forth the cost approach valuation method.

The Concessions Policies Act was passed to encourage and to aid private development to satisfy the increasing demand for accommodations and services in the national parks. H.Rep. No. 1426, 88th Cong., 2d Sess. 4 (1964), S.Rep. No. 765, 89th Cong., 1st Sess. 2, *reprinted in* 1965 U.S.Code Cong. & Ad.News, 3489, 3490, Park Concession Policy, Hearings on H.R. 5872, H.R.

5886, H.R. 5873, H.R. 5887, and H.R. 5796 before the Subcomm. on National Parks of the House Comm. on Interior and Insular Affairs, 88th Cong., 2d Sess. 54 (1964) (Hearings). A primary goal of the statute was to provide the concessioner with sufficient security to secure funding from private sources. The concessioners had difficulty securing financing because they did not own the property on which they built and because their businesses were subject to the approval and supervision of the National Park Service. Hearings, at 51. The act gave the concessioner a possessory interest in the structure which could be used as financing security. The statute also provided compensation for the surrender of this interest. It is this standard which is presently at issue.

Both parties argue the legislative history supports their position. Plaintiffs, relying primarily on the House floor debates, argue the statute requires reconstruction cost less depreciation as the valuation standard.[3] However, in the same debates, fair market value was recognized as a limitation on recovery.[4]

Plaintiffs also argue the concern reflected in the debates that the standard would provide the concessioner with a windfall, at the government's expense, supports its interpretation.[5] It is clear from

---

**3.** Plaintiffs rely on excerpts which state:
"The bill provides for compensation to a concessioner whenever he is deprived of the use of his facilities. Normally this compensation will be measured by the reconstruction cost of the improvement less depreciation * * *." 111 Cong. Rec. 23637 (1965) (statement of Rep. Aspinall). "This section further specified that, unless otherwise provided by mutual agreement, such just compensation should be equal to the sound value of the facilities at the time of the taking upon the basis of reconstruction cost less depreciation." H.R.Rep. No. 1426, 88th Cong., 2d Sess. 15 (1964).

**4.** Representative Brooks stated:
"Under this bill the concessioner's possessory interest would extend beyond the period of his contract and, indeed, in perpetuity unless it is brought back by the U.S. Government at reconstruction cost less physical depreciation, *but not to exceed fair market value.*" 111 Cong.Rec. 23634 (1965). (Emphasis added.)
*See also* H.R.Rep. No. 1426, which states:

"Second, the bill recognizes that compensation must be paid for the possessory interest if it is taken by the government for its own use. Unless otherwise agreed upon by the parties the compensation will be determined—upon the basis of reconstruction cost (of the improvement in question) less depreciation evidenced by its condition and prospective serviceability in comparison with a new unit of like kind—with the market value of the improvement as a top limit." H.R.Rep. No. 1426, 88th Cong., 2d Sess. 5 (1965).

**5.** In support of this position, plaintiff cites the following portions of the legislative history:
"Under this bill, the concessioner can pass his possessory right on to the highest bidder, thus receiving a windfall profit in addition to the profits on his services. Or, if the United States rebuys the possessory right, it must pay the concessioner reconstruction cost at the time of taking less physical depreciation even though the concessioner has fully amortized his costs

the hearing reports that there was concern the National Park Service would, at the end of a contract term, replace the concessioner with another concessioner and that the second concessioner would utilize the first concessioner's facilities without compensating the first concessioner. The valuation standard was designed to prevent a windfall by the second concessioner. As Representative Hartzog stated:

> On the other hand, if we decide that we should change concessioners and that an existing concessioner should be replaced

by a new concessioner who would have a possessory interest in the facilities, then the concessioner should be paid the market value or the sound value. Otherwise, in transferring the possessory interest, the successive concessioner might get a windfall.

Hearings, p. 108.

The hearings make it clear that the valuation standard was not designed to give the concessioner a windfall or to protect the concessioner from a bad or outmoded investment.[6]

---

and the rates charged the public have included the full return of his investment.

"For example, a concessioner may have invested $100,000 in a facility in 1920 which would cost $500,000 to build today. He may have fully recovered his $100,000 years ago, but, if the United States does not renew his contract, it could divest the concessioner of his possessory right only by paying him the $500,000 less some physical depreciation.

"A more reasonable protection would be to provide for payment to the concessioner of the unamortized book value of the facilities. In that way he is assured of recovering his investment but his profit is made on the services provided. He can no longer gamble on windfall profits from appreciated park property values to be reflected in higher charges by subsequent concessioners to the traveling public."
111 Cong.Rec. 23635 (1965) (statement of Rep. Brooks).

"Mr. MOORHEAD. I would like the gentleman from Texas to discuss this valuation of the possessory interest. It appears to me when we refer to reconstruction costs less depreciation as the measure of value of the possessory interest, we could get into trouble. For example, if a building were constructed 20 years ago at a cost of $300,000 and it were completely depreciated and written off the concessionaire's books, but if today because of price rises it would cost $600,000 to reproduce the building, would not this be a windfall to the concessionaire if the Secretary decided to terminate his contract?

"Mr. BROOKS. It certainly would, and at the cost to every one of the 195 million people in this country who want to go out and participate in the benefits of our great national parks. You are exactly right.

"Mr. MOORHEAD. I thank the gentleman.

"Mr. BROOKS. The original cost might be $300,000 and 20 years later it might cost $600,-000 to build it. He may have depreciated every single dollar of it and have it on the books for nothing. Yet for another concessionaire to come in under this legislation, the Government will be required to recoup for that concessionaire his reconstruction cost minus the physical

depreciation, which might be 10 or possibly 20 percent."
111 Cong.Rec. 23642–43 (1965). *See also* 111 Cong.Rec. 23643–44 (1965); 111 Cong.Rec. 23634 (1965).

6. Evidence of this intent is throughout the hearings.

"Mr. KYL. A windfall as the Secretary pointed out yesterday, a windfall to a succeeding concessioner, or a windfall to a retiring concessioner, we want to see that persons are fairly compensated who have been engaged in business, and by the same token we do not want a successor concessioner to have a windfall."
Hearings, at 145.

"Mr. MARSH. Now, it would appear that termination could occur in four manners. First, normal expiration of the term. Secondly, by fire or other act of God. Three, by default by the concessioner, for two reasons, either poor management on his part, or because there is no business there to support the concession. And lastly, by some act of Government for any reason other than the first three that I have named whereby Government terminates because they need it for a military facility or for some other use.

"What values would you intend to pay in those instances where there is normal expiration of the term? What value would you pay? Fair market value?

"Mr. HARTZOG. Normal expiration of the term he has a continuing possessory interest and if we renew there is no payment. But if we decide to discontinue the operation at the expiration of its term then we pay the book value. If we decide at the expiration of the term to substitute a new concessioner, the new concessioner pays the sound value.

"Mr. MARSH. If there is some act of God?

"Mr. HARTZOG. His insurance would have to take care of that.

"Mr. MARSH. So, you require in the contracts that he carry evidently full insurable value?

"Mr. HARTZOG. Insurance that an ordinary prudent man would carry.

■ Reconstruction cost less depreciation was adopted as a valuation standard primarily for instances in which there is no fair market value. This alternative formulation was adopted because it was determined that in many instances there would be no market value for the concessioners possessory interest.

Now, what I mean by no market value is there is not the basis to establish a market value that there would be outside. As you know, if you are establishing a market value outside you take the sales in the neighborhood, the price at which they have been sold, somebody is familiar with that. These concession properties may not be sold once in 50 years, and no one can buy them or bid to buy them unless he is a successor concessioner selected by the Park Service, and therefore there is no market in the sense that there is a regular exchange of these buildings that fixes a price at which they are sold.

Hearings, at 144. *See also* S.Rep. No. 765, 89th Cong., 1st Sess. 4, *reprinted in* 1965 U.S.Code Cong. & Ad.News 3489, 3491; 111 Cong.Rec. 23637 (1965). However, fair market value limits recovery in instances where it can be determined.

"Mr. MARSH. Now, in the default questions you would pay the book value where there has been default by the concessioner?

"Mr. HARTZOG. Depending on whether or not it was default and complete termination, or default and substitute; book value in the first instance and sound value in the last instance.

"In other words, he could default for unsatisfactory service and still with a replacement concessioner collect sound value.

"Mr. MARSH. So, then when there was a termination by some act of Government you would pay—

"Mr. HARTZOG. On the same basis.

"Mr. MARSH. Fair market value?

"Mr. HARTZOG. The same basis. Book value, if it is to be discontinued, sound value if it is to be relocated or if a substitute concession is to come in.

"Mr. MARSH. It seems that in a sense of fairness to these people that are there, that when there has been termination over which they have no control, that some form of compensation would be in order, but I appreciate your replies on that."

Hearings, at 109–10.

"Any decision contemplated by the Park Service with respect to the administration of na-

Fair market value is generally defined as the amount a willing buyer would pay a willing seller, with neither party being under any compulsion to buy or sell and with both parties being fully informed as to all relevant matters regarding the transaction. *See United States v. Miller,* 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943); *United States v. 91.90 Acres of Land,* 586 F.2d 79, 86 (8th Cir.1978) *cert. denied,* 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979); *Snowbank Enterprises, Inc. v. United States,* 6 Cl.Ct. 476, 484 (1984).

■ Plaintiffs maintain the fair market value standard is inapplicable in this case because there is no market. Plaintiffs argue the bathhouse is a special use property. As the Supreme Court has stated:

At times, however, peculiar circumstances may make it impossible to determine a "market value." There may have been, for example, so few sales of similar property that we cannot predict with any assurance that the prices paid would have been repeated in the sale we postulate of the property taken. We then say that there is "no market" for the property in question. But that does not put out

tional park areas would have to be weighed as to its possible effect upon the concessioner's investment. In this regard it could be noted that concession contracts presently provide assurance that the concessioner shall have the opportunity to earn a reasonable return on his investment and that the acts, policies, or decisions of the Secretary shall be consistent with the objective of furnishing reasonable protection against the loss of such investment and against any substantial increases in costs, hazards, and difficulties of concession operations. If, for some reason, the concessioner runs into financial difficulty, the contract further provides that he may be relieved in whole or in part of any or all of the obligations of the contract for such periods as the Secretary may deem proper. Moreover, the contract grants to the concessioner a preferential right to provide public services at a Federal-owned natural attraction, usually to the exclusion of others. We believe these safeguards afford the concessioner a reasonable opportunity to make a profit and preclude the necessity of the Government compensating the concessioner for loss of investment."

Hearings, at 217. (Statement of William Parker).

of hand the bearing which the scattered sales may have on what an ordinary purchaser would have paid for the claimant's property. We simply must be wary that we give these sparse sales less weight than we accord "market" price, and take into consideration those special circumstances in other sales which would not have affected our hypothetical buyer. And it is here that other means of measuring value may have relevance—but only, of course, as bearing on what a prospective purchaser would have paid. *United States v. Toronto,* 338 U.S. 396, 402, 70 S.Ct. 217, 221, 94 L.Ed. 195 (1949) (footnotes omitted). Special use properties have no market. Examples of such properties include public facilities such as roads and sewers, *United States v. 564.54 Acres of Land,* 441 U.S. 506, 513, 99 S.Ct. 1854, 1858, 60 L.Ed.2d 435 (1979), or a church, college building or clubhouse located in a town in which there is but one religious society, or college, or club. Nichols, Eminent Domain (3rd ed.) § 12.32[1]. *Cf. United States v. 50 Acres of Land,* —— U.S. ——, 105 S.Ct. 451, 83 L.Ed.2d 376 (1984). As discussed below, there is a market for the bathhouse property. Therefore, it is not such a special-use property.

The cases on which plaintiffs rely, *Pete v. United States,* 209 Ct.Cl. 270, 531 F.2d 1018 (1976), and *Thayer-West Point Hotel Co. v. United States,* 106 Ct.Cl. 60, 64 F.Supp. 565 (1946), are inapposite to the present case.[7] *Pete* involved compensation for three custom made cabin barges located in a newly created wilderness area. The court determined that there was no use for the barges in the wilderness area and that it was impractical to relocate them. The court also noted that the barge construction method was not obsolete and that it was likely plaintiff would reconstruct similar barges. As such, the court used repro-

duction cost less depreciation as the valuation standard.

In *Thayer-West* the court determined there was no market for a hotel constructed on a military reservation. The court construed the original lease agreement under which the hotel was constructed and operated to allow reconstruction cost less depreciation as the valuation standard.

In the cases above, the court determined reconstruction cost less depreciation was the appropriate valuation standard because there were no market comparables. The property was unique. However, the fair market value standard may be used if there is merely a reduced market. For example, in *United States v. 564.54 Acres of Land,* 441 U.S. 506, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979), the Supreme Court determined that a non-profit recreational camp was not a special use property. The evidence established that there were 11 recent sales of comparable facilities. Similarly, in the present case the evidence established there are market comparables. The bathhouse may be compared to the other bathhouses on "bathhouse row," or to similar historic, functionally obsolete buildings in comparably sized towns. Indeed, as in *564.54 Acres of Land, supra,* Mr. Sawyers, defendant's expert, compared the bathhouse to 11 similar buildings. This is sufficient to establish a market.

An owner of property is entitled to have the fair market value of his property determined by reference to its highest and best use. *Olson v. United States,* 292 U.S. 246, 256–57, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934); *United States v. 91.90 Acres of Land,* 586 F.2d 79, 86 (8th Cir.1978), *cert. denied,* 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979); *Snowbank Enterprises, Inc. v. United States,* 6 Cl.Ct. 476, 485 (1984). Ordinarily, the highest and best use for property condemned is the use to

---

**7.** Plaintiffs also cite *United States v. Becktold Co.,* 129 F.2d 473 (8th Cir.1942), to support the proposition that historic sites may be considered special use property. *Becktold* involved judicial review of a taking pursuant to the Historic Sites Act, 16 U.S.C. § 461 et seq. In that case, the court merely noted testimony concern-

ing cost of reproduction was appropriate when "a market value could scarcely be established." 129 F.2d at 478 (quoting *Union Electric Light & Power Co. v. Snyder Estate Co.,* 65 F.2d 297 (8th Cir.1933)). In the present case, however, a market can be established.

which it is subjected at the time of the taking. However, the courts recognize that there may be circumstances that require a finding that another highest and best use exists. *United States v. Buhler*, 305 F.2d 319 (5th Cir.1962); *United States v. 77,819.10 Acres of Land*, 647 F.2d 104, 110 (10th Cir.1981) *cert. denied*, 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 441 (1982). In the present case it is clear that use as a bathhouse is not the highest and best use of the structure. Plaintiffs argue the highest and best use of the bathhouse is a museum and visitor center. Defendant maintains the highest and best use is an owner-occupied office building.

■ A proposed use requires a showing of reasonable probability that the land is both physically adaptable for such use and that there is a demand for such use in the reasonably near future. *United States v. 341.45 Acres of Land*, 633 F.2d 108, 111 (8th Cir.1980), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981). (Citations omitted). Just compensation may not be predicated on potential uses which are speculative or conjectural. *United States v. 320.0 Acres of Land*, 605 F.2d 762, 814 (5th Cir.1979); *United States v. 1,291.83 Acres of Land*, 411 F.2d 1081, 1084 (6th Cir.1969). Plaintiffs' experts testified that the highest and best use would be a museum. However, there was no independent market study to determine if there was a demand for a privately-operated museum. Instead, plaintiffs rely on studies considering the use of the bathhouse as a Park Service museum and visitor center. These studies were made by or for the National Park Service. In ascertaining demand, the requirements of the government for the project for which the land is taken must be excluded. *United States v. Whitehurst*, 337 F.2d 765, 772 (4th Cir.1964) (and citations therein). Although plaintiffs presented evidence that in 1962 a private company expressed interest in maintaining offices in a portion of the bathhouse and using the first and second floors as exhibit halls, they did not present evidence of any current possibility of establishing a privately-operated museum. This use appears unlikely.

Defendant maintains the highest and best use of the bathhouse is an owner-occupied office building. This use was determined through a market analysis. Defendant's experts compared the bathhouse to other monumental, functionally obsolete buildings which were converted to office buildings in other cities. Defendant's experts concluded the most economic use of the Fordyce bathhouse was as an owner-occupied office building. On the weight of the evidence, this use appears more probable than plaintiffs' proposed use.

■ Plaintiffs presented no evidence regarding the fair market value of the bathhouse as an office building. Since the concept of fair market value is intimately related to the anticipated selling price of a particular piece of property, courts have generally recognized that sales of comparable properties provide the best evidence of market value. *United States v. Sowards*, 370 F.2d 87, 89 (10th Cir.1966); *see also United States v. 179.26 Acres of Land*, 644 F.2d 367 (10th Cir.1981); *Foster v. United States*, 2 Cl.Ct. 426 (1983); *Snowbank Enterprises, Inc. v. United States*, 6 Cl.Ct. 476, 485 (1984). Using the comparable sales method, defendant's evidence indicated the fair market value of the property was $152,000, Mr. Sawyers' figure, and between $62,000–$74,000, Mr. Bookhout's calculation. Mr. Bookhout's sums were calculated on the basis of the value of historic structures in Hot Springs. Mr. Sawyers' valuation was based on the market price of similar functionally obsolete buildings in cities the approximate size of Hot Springs. It is concluded that Mr. Sawyers' calculation comprises the better reflection of the value of the bathhouse property. Mr. Sawyers' calculation is based on structures which are similar to the bathhouse rather than on sales of historic structures in general as well as on a broad market which includes towns similar to Hot Springs, rather a market which is limited to the Hot Springs area.

*Conclusion*

It is concluded, therefore, that Mr. Sawyers' valuation is accurate and that the fair market value of the bathhouse on the date in question was $152,000. Since it is also concluded that the reproduction cost less depreciation of this property would, on the evidence of record, exceed this sum, plaintiffs are entitled to the fair market value of the bathhouse.

Thus, it is ORDERED that a final judgment be entered awarding plaintiffs $152,-000 pursuant to 16 U.S.C. § 20e as compensation for their possessory interest in the Fordyce Bathhouse.